PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WILLIAM R. HAULBROOK,
            *Plaintiff-Appellant,*

v.

MICHELIN NORTH AMERICA,
INCORPORATED; MICHELIN AMERICAS
RESEARCH & DEVELOPMENT
CORPORATION,

            *Defendants-Appellees.*

No. 00-1546

Appeal from the United States District Court
for the District of South Carolina, at Greenville.
Margaret B. Seymour, District Judge.
(CA-98-2303-6-24)

Argued: January 22, 2001

Decided: May 24, 2001

Before WILLIAMS and MOTZ, Circuit Judges, and
Claude M. HILTON, Chief United States District Judge for
the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Judge Motz and Chief Judge Hilton joined.

## COUNSEL

**ARGUED:** Benjamin M. Mabry, CROMER & MABRY, Columbia,
South Carolina, for Appellant. Ashley Bryan Abel, JACKSON,

LEWIS, SCHNITZLER & KRUPMAN, Greenville, South Carolina, for Appellees. **ON BRIEF:** Kristin E. Toussaint, JACKSON, LEWIS, SCHNITZLER & KRUPMAN, Greenville, South Carolina, for Appellees.

---

## OPINION

WILLIAMS, Circuit Judge:

In this case, William Haulbrook appeals from the district court's grant of summary judgment rejecting his claims under the Americans with Disabilities Act (ADA), 42 U.S.C.A. §§ 12101 *et seq.* (West 1995), against defendant-appellees Michelin North America, Inc. ("MNA") and Michelin Americas Research & Development Corp. ("MARC"). Haulbrook argues that disputed issues of material fact precluded the district court from granting summary judgment in favor of MARC and MNA on his discriminatory termination and retaliation claims under the ADA. For the reasons set forth below, we affirm.

I.

A.

MARC is the research and design subsidiary of the French company Compagnie Generale des Etablissement Michelin (CGEM). Manufacture Francaise des Pneumatiques Michelin (MFPM) is also a wholly-owned CGEM subsidiary and constitutes the French portion of the Michelin tire manufacturing combine. MARC's human resource and accounting functions are provided to it through service agreements with its sister company, MNA, which is also a wholly-owned subsidiary of CGEM. MARC pays a fee to MNA for these human resource and accounting services. MNA, MARC and MFPM will be referred to collectively as "Michelin."

Haulbrook holds a Bachelor of Science degree from the University of South Carolina and Masters of Science and Ph.D. degrees in Chemical Engineering from the Massachusetts Institute of Technology. Haulbrook was hired on August 9, 1993 as a research chemical

engineer at MARC's Greenville, South Carolina research and development facility. Haulbrook was supervised by MARC employees Prashant Prabhu, Ralph Hulseman, and Kevin Wallace. At MARC, Haulbrook was responsible for rubber compounding and was involved in various research projects. When his performance was evaluated by Hulseman in January of 1994, Haulbrook indicated that he was flexible with respect to a foreign assignment. Senior MARC and MNA managers decided to assign Haulbrook to work in France, in part for training purposes, at a French Michelin facility owned by MFPM. On September 12, 1995, Haulbrook left the U.S. to work for MFPM in Clermont-Ferrand, France. To obtain a Certificate of Social Security coverage in France, Michelin represented to the U.S. Social Security Administration that MARC was Haulbrook's U.S. employer, that MFPM was his French employer, and that he was expected to return to the U.S. on August 1, 1998. MNA/MARC referred to Haulbrook's work in France as an "assignment." (J.A. at 824.)

While working in France, Haulbrook was paid $29,856.00 annually by MARC via MNA, and was paid 260,000 French francs in 13 equal installments per year by MFPM. The U.S. dollar payments, from MARC's expatriate fund, were paid, at least in part, in order to enable Haulbrook to maintain his retirement benefits, remain in MARC's U.S. health plan, and remain in the Social Security system. Upon his arrival in France, Haulbrook signed a contract with MFPM, written in French, a language in which he had limited proficiency, stating that he was an MFPM employee and providing that he would be paid 260,000 French francs per year, without mentioning the dollar-denominated payments he was to receive from MARC. Haulbrook did not formally resign as an employee of MARC when he went to France.

At the MFPM facility, in addition to working on MFPM projects, Haulbrook worked on some projects that he had begun at MARC in the U.S. In September of 1995, Haulbrook was visited in France by his U.S. supervisor, Hulseman, who presented him with an organizational chart listing Haulbrook as Hulseman's subordinate in the American company as of January 1996. When he was in France, however, Haulbrook's supervisors were all employees of MFPM, and Hulseman had no supervisory control over Haulbrook there.

In late February of 1996, Haulbrook began to work at the "VIC" mixer, an industrial-size mixer that was insufficiently ventilated. Frequent malfunctions of the mixer would cause it to expel clouds of carbon black and other chemicals which Haulbrook inhaled. Haulbrook began to cough up black mucus and experience breathing problems. J.A. 720. As a result, he visited an MFPM physician, Dr. Lancelot, in France on March 11, 1996, and thereafter visited Dr. Marie-Claude Denizet, a general practitioner. On June 6, 1996, continuing to complain of respiratory problems, he visited an ear-nose-throat specialist, Dr. Morlat. Haulbrook also saw a Michelin physician. Dissatisfied with his treatment, Haulbrook requested of MARC officials and his French managers that he be allowed to return to the U.S. for medical treatment. MNA/MARC managers and MNA Medical Director, Dr. Brill, already had begun to communicate among themselves regarding Haulbrook's illness and the possibility of his return to the U.S. for treatment. MARC manager, Noland, told Haulbrook to "come home and get [his] medical stuff taken care of." (J.A. at 950-51, 957-58.) On August 20, 1996, MNA managers decided to declare Haulbrook on a medical leave of absence while he was in France. J.A. 777. While in France, Dr. Brill examined Haulbrook's work site and prepared a report to MNA manager Andrews, which was copied to MNA's in-house counsel.

Haulbrook returned to the U.S. on August 22, 1996, and was seen by Dr. Christopher Marshall on September 6, 1996. Haulbrook received follow-up appointments with Dr. Marshall on September 23, 1996 and October 10, 1996. Via correspondence with MNA manager Andrews, Haulbrook provided MNA with his address and telephone number in Lexington, SC. Dr. Marshall put Haulbrook on steroids, bronchodilators, and other medication, and within a short time, Haulbrook reported improvement in his condition. On October 1, 1996, prior to performing a methacholine challenge test to determine whether Haulbrook had "reactive airways disease," Dr. Marshall wrote in a letter that was provided to MARC/MNA that Haulbrook could return to work if he was not exposed to any dust, chemicals, or other irritants. On October 3, 1996, Haulbrook underwent a methacholine challenge test; the results were negative, meaning that Haulbrook did not have reactive airways disease. Dr. Marshall later testified that Haulbrook could have returned to work without restric-

tion on October 10, 1996. The record does not indicate when Haulbrook became aware of this negative test result.

On October 11, 1996, MFPM communicated to MNA/MARC that it needed about three weeks of Haulbrook's time "to clean up the mess he left" there, but preferred that he perform this work from the U.S. because he had "burned a lot of bridges" in France. (J.A. at 694.) MARC considered repatriating Haulbrook around this time, but contemporaneous notes indicate some uncertainty as to whether a job was available in Greenville for Haulbrook. Hulseman testified that by "repatriate," MARC meant "come back to one of the U.S. companies," or be "rehired" by MARC. (J.A. at 987.) MARC hoped to employ Haulbrook in one of the company's several research buildings, but thought one of the buildings might not be able to meet Dr. Marshall's restrictions. Hulseman testified that MARC did not know how Haulbrook's medical restrictions would play out but suspected that he might be so sensitive to chemicals that MARC would be better off assigning him to work in a building further from the mixing of chemicals to prevent difficulties.

On October 9, 1996, MNA managers Andrews and Deveix wrote Haulbrook on MNA letterhead. They stated that they would like to speak with him to "review the different possibilities and requirements that would satisfy [his] Doctor and the Company [sic] needs." (J.A. at 1034.) They also requested that Haulbrook meet with the company doctor, as is required of all employees who have been on a Medical Leave of Absence, and noted that a phone message from Andrews on October 3 had produced no response and thus, the company was sending the letter by certified mail. They also requested that Haulbrook make contact with either Deveix or Andrews by October 14, 1996, calling collect if necessary; the letter provided home and work telephone numbers for both Deveix and Andrews. Haulbrook responded with a fax, sent at 11:03 PM on October 14, stating only that "this is a serious matter and there is much to discuss. I will try to call you as soon as possible to elaborate." (J.A. at 790.) Haulbrook testified that he could have simply called Andrews or Deveix, but he preferred to speak to his lawyer first. Andrews next left Haulbrook a telephone message asking him to contact MNA/MARC on October 15; in response, Haulbrook sent Andrews a fax at 12:03 AM on October 16, stating, "I am seeking counsel to best deal with this situation, and I

will be able to discuss it further in about two weeks." (J.A. at 792.) Also, on October 15, Mr. Deveix, Personnel Manager for MNA, sent Haulbrook a letter stating that the company had made an appointment for Haulbrook to meet with the company's doctor on October 17, and stating that "it is imperative" that Haulbrook contact representatives of Michelin to "resolve the medical leave situation. Failure to do so could result in disciplinary action up to, and including termination." (J.A. at 785.) Haulbrook responded with a letter, faxed at 10:42 PM on October 16, stating that his situation "involve[d] serious limitations on my abilities as a chemical researcher — for Michelin or otherwise — as well as long-term health implications." (J.A. at 399.) Haulbrook's letter also stated that the situation required him to seek legal counsel in crafting his further communications with Michelin regarding the leave situation, that Haulbrook was unwilling to discuss his "illness" with MNA/MARC without the participation of legal counsel, and that he was unable to appear for the company's October 17 doctor's appointment "due to scheduling conflicts with my legal counsel." (J.A. at 791.) Haulbrook also wrote that MNA/MARC's statement in its letter of October 15 that failure to "come into contact with representatives of [MNA/MARC] to resolve [his] medical leave situation" could result in termination "is duly noted, though its exact meaning is vague." (J.A. at 791.) No one at MNA/MARC contacted Haulbrook in response to his failure to appear on October 17.

On November 4, 1996, apparently after Haulbrook's attorney, Douglas Churdar, initiated contact, Haulbrook, Churdar, Andrews, and Gerard Beard, MNA's in-house counsel, met to discuss his situation. Haulbrook offered to be examined by the company physician, stated that he was seeking reasonable accommodation in accordance with the ADA, and represented that with such accommodation, he was prepared to return to work immediately. Beard responded that MNA/MARC had no responsibility for Haulbrook because he had not been an MNA/MARC employee since September of 1995, when he went to France, and stated that no physical examination would be necessary. Andrews later testified that MNA/MARC's position on whether to put Haulbrook back to work in the U.S. changed "during the time of the legal counsel issues . . . around that November meeting." (J.A. at 766-67.)

After the November 4 meeting, MFPM continued its efforts, which began prior to November 4, to contact Haulbrook regarding his job

in France. For example, MFPM sent a letter on October 23 to Haulbrook's U.S. address, stating that it was imperative that he present himself in France to MFPM management no later than November 12, and offering to pay for his travel. On November 12, 1996, Louis Joly, MFPM's human resources manager, again wrote to Haulbrook to advise him that a meeting would be held on November 22 to discuss the prospect of his dismissal, and stating that if Haulbrook was unable to attend, he could send written comments. In response, Churdar sent a letter to Andrews and Beard at MNA, faxed at 7:11 P.M. on November 21, demanding reasonable accommodation, apparently at the Greenville facility, warning MNA/MARC to "take every precaution in the way in which this matter is handled, because [Haulbrook] has a number of legal options should the matter not be handled appropriately," and requesting that these concerns be relayed to MFPM. (J.A. at 826-27.) On November 25, MFPM personnel manager Joly wrote to inform Haulbrook that due to his failure to fulfil the responsibilities of his position at MFPM since August 23, and his failure to respond to repeated requests for explanations and repeated ultimatums, he was to be terminated effective November 30. Haulbrook was terminated on November 30 by MFPM, at which point his income from both MFPM and MARC ceased.

B.

On August 7, 1998, Haulbrook filed this action in the U.S. District Court for the District of South Carolina against MNA and MARC, alleging that he had been discriminated against in his employment on the basis of a disability, in violation of the ADA. On December 4, 1998, Haulbrook filed an Amended Complaint alleging that he was terminated wrongfully based on his actual or perceived disability in violation of the ADA and that he was terminated in retaliation for his request for accommodation of his alleged disability. The matter was referred to a U.S. Magistrate Judge pursuant to 28 U.S.C.A. § 636(b) (West 1993 & Supp. 2000) for a Report and Recommendation. Following substantial discovery, MNA and MARC separately moved for summary judgment on each of Haulbrook's claims. On December 8, 1999, the magistrate judge, considering both motions jointly, recommended denying MNA and MARC's summary judgment motions. On December 23, 1999, MNA and MARC filed joint objections to the magistrate judge's recommendation. (J.A. 1261.) On March 31, 2000,

the district court rejected the recommendations of the magistrate judge and granted MNA and MARC's motions for summary judgment in full. The district court found that there was insufficient evidence to support a finding that MNA/MARC regarded Haulbrook as substantially limited in the major life activities of breathing or working and that Haulbrook failed to offer any evidence to rebut MNA/MARC's reasonable, non-retaliatory reason for his termination.

## II.

This Court reviews a grant of summary judgment de novo, viewing all facts and inferences in the light most favorable to the nonmoving party. *See Providence Square Assoc., L.L.C. v. G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000). Summary judgment should be granted only when it is perfectly clear that no issue of material fact exists, and it is not necessary to inquire further into the facts in order to clarify the operation of the law. *McKinney v. Bd. of Trustees of Mayland Cmty. Coll.*, 955 F.2d 924, 928 (4th Cir. 1992). All "evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In determining whether summary judgment is appropriate, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. "[A] complete failure of proof concerning an essential element of [a plaintiff's] case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

On appeal, Haulbrook makes two claims: first, that the district court erred in granting summary judgment relative to his claim that he was terminated becase he was "regarded as" disabled under the ADA, and second, that the district court erred in granting summary judgment relative to his claim that he was terminated in retaliation for asserting his rights under the ADA. We will first address the discriminatory discharge claim and then turn to the retaliation claim.

## III.

In an ADA wrongful discharge case, a plaintiff establishes a *prima facie* case if he demonstrates that (1) he is within the ADA's protected

class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*, 53 F.3d 55, 58 (4th Cir. 1995). One is within the ADA's protected class if one is "a qualified individual with a disability." 42 U.S.C.A. § 12112 (West 1995). The ADA defines "disability" as a physical or mental impairment that substantially limits one or more of the major life activities of an individual, a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C.A. § 12102(2) (West 1995). Haulbrook does not contend that he was actually disabled at the time of his termination; instead he maintains only that he was "regarded as" disabled under the ADA. (J.A. at 1276.) Haulbrook claims that Michelin regarded him as substantially limited in the major life activities of working and breathing.

An individual is regarded as being disabled if he is regarded or perceived, albeit erroneously, as having an impairment that substantially limits one or more of his major life activities. 42 U.S.C.A. § 12102(2) (West 1995). One may be "regarded as" disabled under the ADA if either "(1) a covered entity mistakenly believes that [one] has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). The fact that an employer is aware of an employee's impairment, without more, is "insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action."[1] *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996).

---

[1]Haulbrook asserts, and the district court found, that a disputed issue of fact exists as to whether MNA/MARC and MFPM are a single employer for purposes of ADA liability. *See*, *e.g.*, *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997) (explaining various approaches to determining whether companies constitute a single employer under the ADA). We agree; the factual record on summary judgment is insufficiently developed with respect to issues such as centralized control of labor relations, common management and interrela-

## A.

As to the issue of whether Haulbrook was regarded by Michelin as disabled, the district court concluded that, resolving all factual disputes in Haulbrook's favor and giving him the benefit of all reasonable inferences, the record demonstrates that Michelin did not know the extent of Haulbrook's illness and sought further information regarding the nature of his impairment. The district court further reasoned that MARC and MNA's repeated and strenuous efforts to secure Haulbrook's return to work cause his claim that they regarded him as disabled in the major life activity of working to "fly in the face of common sense." (J.A. at 1278.) The district court also concluded that Haulbrook failed to demonstrate that Michelin harbored misperceptions regarding his ability to breathe adequately. We agree.

Haulbrook contends, relying on the testimony of MARC manager Hulseman, that evidence established that MARC and MNA managers were concerned that one of MARC's buildings might not be able to meet the preliminary medical restrictions imposed by Haulbrook's doctor. As to Haulbrook's claim that Michelin regarded him as substantially limited in the major life activity of working, this evidence is insufficient as a matter of law. This Court, interpreting the parallel provisions of the Rehabilitation Act, has held that one is not substantially limited in the major life activity of working unless one is barred from generally obtaining employment of a given type, as opposed to being barred from a specific job. *See Gupton v. Virginia*, 14 F.3d 203, 205 (4th Cir. 1994); *see, e.g.*, *Duncan v. Wisconsin Dept. of Health and Family Servs.*, 166 F.3d 930, 935 (7th Cir. 1999) (noting that under the ADA and the Rehabilitation Act, an employee is not regarded as disabled in the major life activity of working unless employer perceives him as being disqualified from a broad variety of

tionship of operations to permit a definitive conclusion as to this issue. However, because we conclude that Haulbrook failed to present sufficient evidence that he was regarded as disabled and failed to create a triable issue of fact as to the validity of Michelin's legitimate reasons for his termination, we need not resolve this issue, but instead, we simply assume for purposes of this appeal that Michelin is a single enterprise for ADA purposes.

jobs). The evidence indicates that MNA/MARC believed Haulbrook could continue to perform his previous job, but simply believed that he might have to be assigned to perform the same work in a different building. Thus, the possibility of placement in a different building with less chemical exposure fails as a matter of law to establish a perception that Haulbrook was substantially limited in the major life activity of working because no evidence indicates that MNA/MARC believed Haulbrook was disqualified from a broad variety of jobs.

Haulbrook also argues that internal MARC/MNA notes reflect a perception that he was disabled. The notes of Hulseman and Dr. Brill indicated that they believed it was possible that Haulbrook was highly sensitive to various chemicals. The substance of these notes, however, was merely to record the information contained in Haulbrook's communications to Michelin, through his doctor and otherwise. Thus, this evidence indicates that Haulbrook represented to Michelin that his condition was serious, but it does not establish that Michelin actually regarded him as disabled. The district court correctly concluded that MNA/MARC's repeated efforts to get Haulbrook to see a company doctor and return to work refutes any claim that they took his statements at face value. Rather, Michelin did what an employer committed to meeting its ADA responsibilities in good faith would do: It sought to open a dialogue with Haulbrook and obtain further, accurate information regarding his condition so that it could craft an appropriate accommodation. Michelin's attitude towards Haulbrook deteriorated only after he repeatedly and pointedly refused to speak to his superiors regarding his condition.

As to Haulbrook's claim that Michelin regarded him as substantially limited in his ability to breathe, the company's internal communications simply reflect uncertainty about Haulbrook's condition. Hulseman's notes state that "the question was" whether Haulbrook was hyper-allergic to very small quantities of dust, chemicals, and so forth. (J.A. at 1180-81.) At most, the record establishes that Haulbrook was "regarded as" being under medical evaluation. Haulbrook engages in an impermissible quantity of bootstrapping by failing to cooperate with his employer's attempt to determine the scope and nature of his disability, then pleading the employer's interest in determining whether and to what extent he might be disabled as a "suspicion" of disability, and finally asserting that he satisfies the regarded-

as prong of the disability definition. Haulbrook's responses to Michelin's earnest requests for information consisted of cryptic midnight faxes, when his superiors asked him to call immediately, and absolute refusal to reply to his MFPM superiors, in the face of increasingly insistent demands that he do so.

Had Haulbrook exercised reasonable diligence in determining the results of his methacholine challenge test and engaged in a reasonable dialogue with Michelin, Michelin would have known that as of October 10 (a month and a half prior to his termination) Haulbrook's physician determined that he did not have reactive airways disease and could return to work with no medical restrictions. Any misperception on Michelin's part after October 10 is therefore directly chargeable to Haulbrook's improper conduct and may not form the basis for an ADA "regarded-as" claim. The ADA is a shield against discrimination on the basis of disability; it is not a sword enabling employees who are not, in fact, substantially limited in any major life activity to refuse reasonable requests by their superiors for information and then plead their superiors' resulting lack of information as a "regarded-as" disability. *Cf. EEOC v. Sara Lee Corp.*, 237 F.3d 349, 356 (4th Cir. 2001) (observing that "the ADA operates as a shield against discrimination; the statute is not a sword.").

Haulbrook further argues that an inference that Michelin regarded him as disabled is appropriate based on the temporal proximity of his October 16 letter, in which he refused to meet with Michelin without his attorney present and stated that his condition involved serious limitations on his abilities as a researcher, and MNA/MARC's November 4 statement that Haulbrook was not an MNA/MARC employee. However, this subsequent lack of interest on the part of MARC and MNA was not a termination; Haulbrook continued to receive full pay (including that portion of his pay provided by MARC and MNA) until November 30, and he was not given notice of termination until November 25. Nor did the subsequent lack of interest on the part of MARC and MNA involve any discernable change in Haulbrook's working conditions or benefits; Haulbrook was performing no work prior to November 4, and he continued to receive full pay and benefits until his termination at the end of November. Given that Haulbrook's intimations of a medical condition which might impair his ability to work began far earlier than his October 16 letter, we do not believe

that a reasonable finder of fact could infer just from the timing of Haulbrook's termination that he was "regarded as" disabled. Instead, the compelling inference supported by the record taken as a whole is that Michelin simply ran out of patience after Haulbrook consistently refused to communicate in a reasonable manner with his superiors. MNA/MARC lost interest in assisting Haulbrook after weeks of evasive midnight faxes in response to direct requests to call his superiors. After Haulbrook also failed to respond to MFPM's requests to come into contact with his French superiors, MFPM finally terminated him on behalf of the combined entity.

B.

Haulbrook next argues that a reasonable factfinder could determine that MFPM's proffered reason for termination was pretextual because evidence indicated that MFPM felt he had "burned a lot of bridges" in France and that MFPM did not want him to return to France to complete his work. Haulbrook, however, has produced no evidence that MFPM's less than glowing opinion of his work in France had any nexus at all to any perceived disability or to any protected activity under the ADA. The statement of a person associated with MFPM that Haulbrook had "burned a lot of bridges" was made on October 11. (J.A. at 694.) Haulbrook was not terminated until November 30, more than a month and a half later. Given the extensive efforts by both MNA/MARC and MFPM to engage in a dialogue with Haulbrook for the purpose of evaluating his medical situation and determining an appropriate resolution, a reasonable factfinder could not conclude that MFPM's statement that Haulbrook had "burned a lot of bridges" was probative of pretext; instead, the clear evidence establishes that Haulbrook's repeated and intentional refusal to reply to MFPM's letters seeking information regarding his medical leave situation motivated MFPM to discharge him. The fact that an employee who is terminated for failure to communicate with supervisors also is viewed as having performance problems unrelated to a disability does not establish that the stated reason for termination is pretextual.[2]

---

[2]Haulbrook also argues that MNA/MARC's November 4 statement that he was not an employee was a "lie" which permits an inference that MNA/MARC was attempting to cover up a discriminatory purpose.

IV.

Haulbrook argues that the proximity in time of his termination to his assertion of legal rights, coupled with the alleged falsity of MNA/MARC's proffered reason for his termination, enables him to establish a retaliatory discharge claim under the ADA. A retaliatory discharge claim under the ADA has three *prima facie* elements: Haulbrook must show (1) that he engaged in protected activity; (2) that his employer took an adverse action against him; and (3) that a causal connection existed between the adverse activity and the protected action. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). If Haulbrook satisfies this burden, MNA/MARC must articulate a reasonable, nonretaliatory reason for his termination; if they do so, Haulbrook must demonstrate that the proffered reason is a pretext for forbidden retaliation. *Id.*

The record shows a termination and shows protected activity — Haulbrook's November 4 request for an accommodation.[3] Giving

_____

(Appellant's Br. at 19-20.) Given the legal complexities of Haulbrook's employment relationship with various Michelin entities, we do not believe that one could reasonably find this statement to be a factual misrepresentation of the sort capable of invoking a permissible inference of discrimination. *Cf. Reeves v. Sanderson Plumbing*, 530 U.S. 133, 147 (2000) (stating that a finding of pretext permits the trier of fact to infer discrimination from the falsity of the employer's explanation). It is undisputed that Haulbrook worked in France under the direct supervision of MFPM employees and was not expected to return to the U.S. until 1998. The fact that Haulbrook continued to draw a salary from MNA/MARC for purposes of U.S. benefits eligibility, combined with the fact that MNA/MARC considered repatriating him, means only that his status as an MNA/MARC employee was legally ambiguous. Given that MNA/MARC continued to pay Haulbrook's U.S.-derived salary after telling him that he was no longer an "employee," the only reasonable interpretation of their denials of employee status is that they were no longer interested in repatriating him to perform his work in the U.S. No evidence indicates that this statement was a "lie."

[3]Haulbrook's refusal to communicate with his superiors until he spoke to his attorney and refusal to meet with his superiors without his attorney

Haulbrook the benefit of all reasonable inferences, a contested issue of fact arguably exists as to the causal connection between his accommodation request and termination, due solely to the proximity in time of his termination on November 25 and his assertion on November 4 of a right to accommodation under the ADA.

However, even if there is a question of fact as to this issue, the question of fact is not material because the proffered legitimate reason for Haulbrook's termination — his disregard of MFPM's demands that he at least communicate with them regarding his situation while drawing a full paycheck and doing no work — was not rebutted effectively. Assuming that Michelin is a single entity for ADA purposes, *see supra* note 1, we observe that South Carolina defines insubordination as "a wilful or intentional disregard of the lawful and reasonable instructions of the employer." *Porter v. Pepsi-Cola Bottling Co. of Columbia, Inc.*, 147 S.E.2d 620, 621 (S.C. 1966). Plainly it was reasonable for MFPM to request that Haulbrook communicate directly with his French superiors rather than with MNA or MARC, and MFPM's communications asked Haulbrook to contact specific individuals at MFPM in France. Haulbrook responded by sending materials to MNA/MARC in Greenville, SC. After MFPM continued to write Haulbrook, stating that no response had been received, it surely was evident to him that he was not following MFPM's instructions to communicate with MFPM and not MNA/MARC. One division of the company was entitled to specifically request that Haulbrook communicate with it, rather than with another division, and Haulbrook was required to comply with these requests. Single-enterprise liability under the ADA does not entitle employees to choose precisely to whom they wish to speak within a large corporation; in the face of MFPM's emphatic and repeated requests that Haulbrook contact specific individuals within MFPM, he was not entitled to ignore these requests. His intentional and repeated refusal to communicate with the appropriate individuals within Michelin thus provided Michelin with

---

present, are not protected activities under the ADA. *See Staub v. The Boeing Co.*, 919 F. Supp. 366, 370 (W.D. Wa. 1996) (finding frivolous a claim that the ADA affords a right to have counsel present at an internal meeting to discuss an employee's future). Therefore, the first protected activity capable of grounding an ADA retaliation claim is Haulbrook's November 4 request for reasonable accommodation.

a valid reason to discharge him. Aside from the evidence contained in Hulsemann's notes that Haulbrook had "burned a lot of bridges" in France, no evidence at all casts doubt on the proposition that MFPM fired Haulbrook, as it said in its correspondence it would do, if he failed, as he did, to contact his French superiors in response to urgent letters. Haulbrook utterly failed to rebut Michelin's legitimate, non-retaliatory reason for his discharge. Accordingly, the district court correctly found the absence of any disputed issue of material fact as to the retaliation claim.

## V.

We are cognizant of the ADA's important purpose in protecting individuals who are regarded as disabled from discriminatory treatment in employment. The ADA, however, does not abrogate the general duty of an employee to respond to direct and reasonable requests of his employer for information and cooperation regarding a potentially disabling condition. The record in this case establishes that Haulbrook's complete refusal to cooperate with Michelin's good-faith efforts to determine the nature of his possible disability and craft any necessary accommodations was the cause of his termination. The judgment of the district court is therefore affirmed.

*AFFIRMED*