**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KENNETH L. MYERS; LINDA S.
MYERS, on behalf of themselves and
all other employees of Baltimore
County, Maryland similarly situated;
THOMAS T. FREELAND; FRANK JAMES
SNYDER; PATRICIA ANN THOMPSON;
ROBERT M. MILLER; JUNE L. MILLER;
PAULETTE D. WINIARSKI; STANLEY F.
WINIARSKI; BERNICE C. CLARK; JAMES
D. CLARK, JR.; LORETTA G. HOWARD,
Personal Representative of the
Estate of George W. Howard;
VERNON CLIFTON POE; JOANN
VIRGINIA POE; RICHARD J.
DANNENFELSER, JR.; SUSANNE K.
DANNENFELSER; CARTER LEE RAY;
ANNIE VIRGINIA RAY; JOSEPH R.
ANTHONY; PAMELA K. ANTHONY;
FLOYD BEECHER BRINSON, Personal
Representative of the Estate of
Norma Brinson; HAZEL L. FREELAND,
            *Plaintiffs-Appellants,*

                v.

BALTIMORE COUNTY, MARYLAND,
            *Defendant-Appellee.*

No. 01-2356

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, District Judge.
(CA-99-2561-MJG)

Argued: June 5, 2002

Decided: October 7, 2002

Before WILLIAMS and GREGORY, Circuit Judges, and
Frederick P. STAMP, Jr., United States District Judge
for the Northern District of West Virginia,
sitting by designation.

---

Affirmed by unpublished opinion. Judge Williams wrote the majority
opinion, in which Judge Stamp joined. Judge Gregory wrote a dissent-
ing opinion.

---

**COUNSEL**

**ARGUED:** Francis Donald DeMuro, LAW OFFICES OF JOSEPH S.
LYONS, Towson, Maryland, for Appellants. Paul M. Mayhew,
COUNTY ATTORNEY'S OFFICE, Towson, Maryland, for Appel-
lee. **ON BRIEF:** George E. Reuling, LAW OFFICE OF GEORGE E.
REULING, Towson, Maryland; James C. Strouse, LAW OFFICE OF
JAMES C. STROUSE, Columbia, Maryland, for Appellants. Edward
J. Gilliss, County Attorney, Jeffrey Grant Cook, Assistant County
Attorney, Towson, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

---

**OPINION**

WILLIAMS, Circuit Judge:

   This appeal arises out of a claim for unpaid minimum wages and
overtime compensation brought by twenty-four individuals who
served as caretakers in Baltimore County, Maryland parks (Caretak-
ers). The Caretakers allege that Baltimore County, their employer,[1]

---

   [1]The issue of whether the Caretakers are "employees" of Baltimore
County for the purposes of the FLSA has not been resolved. The agree-

violated the Fair Labor Standards Act (FLSA), 29 U.S.C.A. §§ 201-209 (1998), and the Maryland Wage and Hour Law (MWHL), Md. Code Ann., Labor and Employment, §§ 3-401 *et seq.* (1999), by failing to compensate them adequately for their work. The district court, concluding that the parties had reached a "reasonable agreement" as provided under 29 C.F.R. § 785.23 (2001), entered an order granting summary judgment to Baltimore Parks. We affirm the judgment of the district court.

## I.

Prior to August 30, 1999, when the program was discontinued, Baltimore County operated a caretaker program that offered free accommodation to two adult individuals, usually a married couple, who agreed to serve as Caretakers in a public park. All twelve Caretaker couples bringing the present action signed a "Baltimore County Department of Recreation and Parks Caretakers Agreement" (the Caretakers' Agreement) in their joint capacity. Under the Caretakers' Agreement, each Caretaker couple was provided with rent-free accommodation and water at a home located in or near the park to which the couple was assigned. In exchange, one of the Caretakers in each couple was required to (1) be continuously present in the park; (2) clean the comfort station and other park areas, as necessary; (3) tour the park in the morning and open the park gate to allow public access; (4) tour the park in the evening and close the park gate; and (5) maintain a Daily Caretaker's Log of any park maintenance required due to damage or vandalism. Discovery revealed that at least one member of each Caretaker couple, with one possible exception, maintained full- or part-time employment outside of the park. In some cases, both worked outside the park. Caretakers were permitted to have extended absences from the park, but seven days advance writ-

---

ment they signed specifically states that "[t]he caretaker is classified as a Tenant/Independent Contractor with Baltimore County and is in no way considered to be an employee of Baltimore County." (J.A. at 594.) Moreover, there is no evidence that the Caretakers reported the rental value of their accommodations as income. For the purposes of this appeal, however, we will assume, without deciding, that the Caretakers are employees of Baltimore County.

ten notice was required, and the Caretakers were responsible for find-ing suitable substitutes.

On March 5, 1999, Baltimore County announced its decision to ter-minate the Caretaker program after August 30, 1999, replacing the Caretakers with part-time employee park attendants. On August 19, 1999, twenty-four individuals who had been serving as Caretakers for durations from three years to over twenty years filed a complaint in the United States District Court for the District of Maryland. The Caretakers alleged that Baltimore County failed to pay the minimum wage required under 29 U.S.C.A. § 206(a)(1) (setting minimum wage at $4.75 an hour beginning on October 1, 1996, and $5.15 an hour beginning on September 1, 1997), and overtime as required under 29 U.S.C.A. § 207(a)(1) (requiring compensation at least one and one-half times the regular rate for hours over forty a week). The Caretak-ers also claimed that Baltimore County violated the MWHL by failing to pay the federal minimum wage, Md. Code Ann., Labor and Employment, § 3-413(1) (providing that employers pay "to each employee who is subject to both the federal Act and this subtitle, at least the minimum wage for that employee under the federal Act"), and by failing to pay overtime, Md. Code Ann., Labor and Employ-ment, § 3-415(a) (requiring "each employer [to] pay an overtime wage of at least 1.5 times the usual hourly wage").

After discovery, the Caretakers and Baltimore County filed cross-motions for summary judgment. The district court applied 29 C.F.R. § 785.23, a regulation interpreting the FLSA, because the Caretakers were residing on Baltimore County's premises. Section 785.23 pro-vides as follows:

An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not con-sidered as working all the time he is on the premises. Ordi-narily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent

facts will be accepted. This rule would apply, for example, to the pumper of a stripper well who resides on the premises of his employer and also to a telephone operator who has the switchboard in her own home.

29 C.F.R. § 785.23. The district court concluded that the Caretakers' Agreement was a reasonable agreement that took into consideration all of the pertinent facts and thus granted summary judgment in favor of Baltimore County.[2] The Caretakers filed a timely notice of appeal, claiming that the district court erred in finding that the Caretakers' Agreement constituted a "reasonable agreement" under 29 C.F.R. § 785.23.[3]

We review a grant of summary judgment de novo, viewing all facts and inferences in the light most favorable to the nonmoving party. *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## II.

The Caretakers seek compensation for every hour that they were required to be present in the park. As discussed below, we conclude that the Caretakers' twenty-four hour presence was not compensable "work" as a matter of law. Moreover, any claim that the Caretakers' Agreement violates the FLSA for failure to compensate the Caretakers adequately for the "work" they did perform would also fail as a

---

[2]The Caretakers argue that the district court erred by applying 29 C.F.R. § 785.23 because the regulation was outside the scope of an earlier order providing that "discovery and trial shall proceed with respect to issues related to . . . the hours per week (or month) for which the Plaintiffs are to be considered as working." (J.A. at 69.) Because § 785.23 addresses when an employee residing on an employer's premises is working, it is not outside the scope of the district court's order.

[3]The Caretakers also argue that the district court erred by denying their motion for summary judgment. Denials of summary judgment, however, are not final orders and, thus, are not generally appealable. *See Hensley v. Horne*, 297 F.3d 344, 347 (4th Cir. 2002).

matter of law. Accordingly, we agree with the district court that the Caretakers failed to establish a genuine issue of material fact regarding whether their agreement is reasonable. Consequently, Baltimore County is entitled to judgment as a matter of law.

A.

As described above, the Caretakers were required to provide twenty-four hour park presence for security purposes. Baltimore County wanted a constant presence in the park to deter vandalism and to have someone on hand to summon the police, fire department, or an ambulance if an irregular situation arose. In essence, their twenty-four hour duty was to live in the park "waiting" for an emergency situation to develop. The Caretakers assert that because their only compensation for being on duty twenty-four hours a day was housing and water use, the Caretakers' Agreement violated the minimum wage and overtime provisions of the FLSA on its face. In *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), the Supreme Court addressed the issue of whether "waiting time" was considered working time under the FLSA. Explaining that there is no legal formula to resolve the issue, the Court stated the following:

> Whether in a concrete case such time falls within or without the [FLSA] is a question of fact to be resolved by appropriate findings of the trial court. This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to waiting time, and all of the surrounding circumstances. Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged.

323 U.S. at 136-37 (citation omitted). "The critical question, the Court has suggested, is 'whether time is spent predominantly for the employer's benefit or for the employee's.'" *Roy v. County of Lexington*, 141 F.3d 533, 544 (4th Cir. 1998) (*quoting Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944)). The Caretakers argue that under the *Skidmore* test, summary judgment is inappropriate because whether they were "engaged to wait" or "waiting to be engaged" is

itself a material issue of factual dispute. This court, however, previously has rejected such a reading of *Skidmore* by determining that an employee was "waiting to be engaged" as a matter of law. *See Kelly v. Hines-Rinaldi Funeral Home, Inc.*, 847 F.2d 147, 148 (4th Cir. 1989) (applying the *Skidmore* test and concluding, as a matter of law, that time the employees spent "living" in an apartment at a funeral home was time "waiting to be engaged" despite their having to answer the phone at any hour during the night and pick up corpses if necessary). Moreover, 29 C.F.R. § 785.23 provides a presumption that when an employee resides on his employer's premises, he is not working the entire time he is on the premises. *See Jarrett v. ERC Properties, Inc.*, 211 F.3d 1078, 1082 (8th Cir. 2000) (noting that no evidence was presented to overcome the presumption). In this case, the Caretakers have failed to produce specific facts to overcome the presumption and support their assertion that they were "working" within the meaning of the FLSA the entire time they were present in the park. The unrefuted evidence demonstrates that an overwhelming amount of the time that the Caretakers were required to be present in the park was available for uninterrupted personal pursuits and use of the house. For example, the Caretakers were free to watch television, eat, and sleep. There is no indication that interruptions of private pursuits were frequent enough to render such time work time, that is, time spent predominantly for the benefit of Baltimore County.[4] The time the Caretakers spent merely waiting for an occurrence requiring their attention, therefore, was time during which they were waiting to be engaged.[5] *See Kelly*, 847 F.2d at 148 ("While there was no clear

---

[4]As noted above, the Caretakers were also free to, and did, pursue employment outside of the park. *See supra* at 3.

[5]The conclusion that the Caretakers were "waiting to be engaged" as a matter of law is not, as the dissent suggests, contrary to *Skidmore*'s "fact-based approach." *Post* at 17. Instead, as in *Kelly*, the determination that the Caretakers, while merely living in the park, were "waiting to be engaged" was based on the facts of the case. Specifically, the evidence presented by the Caretakers demonstrates that other than a set list of duties, which were compensable and are discussed in part II.B, *infra*, the Caretakers' time, both at night and during the day, was their own for personal pursuits, and interruptions of their personal time were infrequent. The Caretakers have failed, in other words, to present evidence to support their claim that the time spent living in the park was time in which

agreement between the parties on the exact nature of the time in question, practical considerations guide us to conclude that [the employee] waited to be engaged."); *see also Service Employees International Union, Local 102 v. County of San Diego*, 60 F.3d 1346, 1355 (9th Cir. 1995) (concluding that requirement of Park Ranger to be on-call to respond to inquiries and enforce park rules was not so restrictive that on-call time could not be used for personal activities). Because the Caretakers have failed to set forth any specific facts in response to Baltimore County's properly-supported motion for summary judgment, we affirm the district court's conclusion that they were "waiting to be engaged" as a matter of law.

B.

While the Caretakers were not working every hour they were in the park, clearly some of the work they performed while living in the park was compensable under the FLSA. Specifically, the Caretakers were required to clean the comfort station and other park areas, as necessary; tour the park twice a day; open and close the park; maintain a Daily Caretaker's Log of any park maintenance required due to damage or vandalism; and summon authorities when emergency situations arose (the FLSA work).[6] As 29 C.F.R. § 785.23 recognizes,

---

they were engaged to wait, that is, time spent predominantly for Baltimore County's benefit. Our holding, therefore, does not alter *Skidmore*'s fact-based inquiry, but rather, as in *Kelly*, applies the fundamental principle that a trial on a factual issue, such as whether time spent living on an employer's premises is primarily for the employee's benefit or the employer's, is only necessary when it "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[6]The district court did not consider whether any of these duties fall under the FLSA's *de minimis* doctrine. *See, e.g.*, *Brock v. City of Cincinnati*, 236 F.3d 793, 804 (6th Cir. 2001) (explaining that courts "treat theoretically compensable work as noncompensable under the FLSA when the amount of such work is negligible"). Most courts, including the Fourth Circuit, treat daily periods of approximately 10 minutes as *de minimis*. *See, e.g.*, *E. I. du Pont de Nemours & Co. v. Harrup*, 227 F.2d 133, 135-36 (4th Cir. 1955); *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984). There is no direct evidence that any of the Caretakers' tasks took less than 10 minutes to complete. Therefore, in viewing the record in a light most favorable to the Caretakers, we will assume that none of the Caretakers' tasks were *de minimis*.

however, it would be difficult to determine the exact hours the Caretakers worked. Unsupervised employees living on their employer's premises may divide their time between "work" and personal pursuits, and the work performed is often sporadic in nature. As the district court pointed out, "[the FLSA work] varied from day-to-day based on a host of factors, some as simple as the season of the year (e.g., comfort stations were closed during the late fall and winter, and consequently, Caretakers were not required to clean them)." (J.A. at 994.) Moreover, it would have been administratively burdensome to record the time it took to complete every duty. In such circumstances, "any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted." 29 C.F.R. § 785.23. An agreement is acceptable under 29 C.F.R. § 785.23 if it "falls within a broad zone of reasonableness, considering its terms and all of the facts and circumstances of the parties' relationship." *Brock v. City of Cincinnati*, 236 F.3d 793, 806 (6th Cir. 2001).

We agree with the district court that there are no genuine issues of material fact regarding whether the Caretakers' Agreement was reasonable under 29 C.F.R. § 785.23.[7] In exchange for the FLSA work, the Caretakers received rent-free accommodation in or near a county park and free water, which is a substantial benefit. *See infra* at 11 (calculating approximate rental value of Caretakers' houses). Further-

---

[7]The Caretakers argue that the district court incorrectly applied a subjective, rather than an objective, standard to determine the reasonableness of the Caretakers' Agreement. Although we agree that 29 C.F.R. § 785.23 requires an agreement to be objectively reasonable, a review of the record makes clear that the district court applied the correct legal standard. Specifically, after concluding that the Caretakers had an overwhelming amount of time for personal pursuits, the district court determined that the agreement was objectively reasonable because a consistent work schedule for the work that was performed would have been difficult to develop and the Caretakers were compensated well above the minimum wage for their work. (J.A. at 996-97.) The district court relied on the Caretakers' subjective opinion only to show that the Caretakers, prior to the termination of the program, agreed with the conclusion ultimately reached by the court that the agreement was objectively reasonable: "They realized full well that they were reasonably compensated and that the Agreement was more than fair to them." (J.A. at 997.)

more, there were clearly other benefits to living in the park that would be difficult to quantify. Living in the park was a unique opportunity for the Caretakers — an environment that most people go out of their way to visit was immediately available to them.[8] *See Brock*, 236 F.3d at 807 (explaining that non-monetary support the city provided reasonably compensated the plaintiffs for any deficiency in their compensation).

Although the Caretakers' Agreement appears reasonable on its face, the Caretakers argue that the district court erred by failing to make a specific finding with regard to the actual number of hours that the Caretakers worked. *See id.* ("The actual amount of time spent in FLSA 'work,' if reliably ascertained, is a reference point for a range of reasonable agreements, a range that is widened by a variety of non-monetary costs and benefits."). Because the purpose of 29 C.F.R. § 785.23 is to address situations in which it is difficult, if not impossible, to determine the exact time worked, a finding of the exact hours worked may not be required to determine whether the agreement was reasonable. Moreover, accepting the Caretakers' highest estimate of the time they spent on FLSA work, the rental value of the Caretakers' residences compensated them at a rate above the minimum wage. The average rental value for the Caretakers' residences, according to the Caretaker's Manual, was $700 per month.[9] Thus, the Caretaker couple

---

[8]In deposition testimony, one Caretaker explained his fondness of living in the park as follows: "I got attached to the park. I mean, I really got attached to it, and I really don't want to live anywhere else. I like it down there. It's like living in the city and the . . . country at the same time." (J.A. at 402-03.)

[9]Baltimore County made this estimate in a report demonstrating the value of the services rendered by the Caretakers. The report concluded that "by utilizing a caretaker, in lieu of an 'around-the-clock' park attendant, Baltimore County is able to realize a cost savings of [$30,582 a year]." (J.A. at 630.) The Caretakers argue that this report demonstrates that Baltimore County willfully circumvented the requirements of the FLSA to enjoy this savings. The possibility that an employee could have received a more favorable agreement, however, does not make the Caretaker Agreement unreasonable. *Brock*, 236 F.3d at 806 ("[A] court must ascertain whether *this* agreement falls within a broad zone of reasonableness."). Moreover, it is unlikely that a park attendant would enjoy the same freedom to pursue personal pursuits as did the Caretakers.

received approximately $23 a day in exchange for the FLSA work. How they chose to divide the FLSA work, and thus the compensation, is irrelevant to whether the agreement reasonably compensates for the specified tasks. The federal minimum wage has been $5.15 an hour since September 1, 1997.[10] 29 U.S.C.A. § 206(a)(1). Dividing the weekly pay by the minimum hourly wage, we conclude that at the minimum wage each Caretaker couple was compensated for no more than 4.5 hours of work per day, approximately 32 hours per week.[11] The Caretakers have presented no evidence demonstrating that compensation for 4.5 hours per day under-approximated the actual amount of FLSA work they performed. One of the Caretakers specifically testified at a deposition that it took between 3 and 4 hours a day to complete the tasks.[12] Because the Caretakers have presented no evidence in response to the summary judgment motion that indicates that the FLSA work engaged each Caretaker couple for more than 32 hours a week, we agree with the district court's conclusion that the rent-free accommodation compensated them well above the minimum wage for the work they performed.[13] Furthermore, because Baltimore County

---

[10]Prior to September 1, 1997, the minimum wage was $4.75 per hour. 29 U.S.C.A. § 206(a)(1). For simplicity's sake, we assume that the higher rate of $5.15 per hour applies to the Caretakers' entire claim even though the lower pre-September 1, 1997 rate may apply to a portion of the Caretakers' claim. The Caretakers filed their claim on August 19, 1999, and there is a two-year statute of limitations for FLSA actions "to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages," except that "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C.A. § 255(a). Of course, assuming that the higher rate applies to the whole claim benefits the Caretakers.

[11]Our calculations are as follows: $700 a month ÷ 30 days a month ÷ $5.15 per hour x 7 days a week = 31.7 hours a week.

[12]The only evidence that a Caretaker worked longer than 4.5 hours in one day is deposition testimony from one Caretaker that occasionally he would spend a 7 or 8 hour day in the park. Even with one 8 hour day, however, the Caretaker would have to work over 4 hours each of the other days to exceed the 32 hours a week for which he was compensated. There was no indication that any Caretaker regularly worked over 4 hours a day.

[13]The dissent argues that Baltimore County, as the moving party, has failed to meet its burden because it has presented no evidence that the

paid the Caretakers no less than the minimum wage under the FLSA, the agreement also does not violate the minimum wage or overtime compensation provisions of the MWHL. Md. Code Ann., Labor and Employment, § 3-413 (requiring employers to pay at least the minimum wage under the FLSA).

### III.

The Caretakers have not set forth any specific facts to support their claim that the Caretakers' Agreement is unreasonable under 29 C.F.R. § 785.23. During their twenty-four hour duty, the Caretakers were waiting to be engaged and thus not performing compensable work for every hour that they were present in the park. In light of the nature and unpredictability of the Caretakers' duties, the district court was correct to conclude that rent-free accommodation in exchange for serving as a Caretaker was a reasonable agreement as a matter of law. Indeed, there is no indication that the value of the rent-free accommodation under-compensated the Caretakers for the FLSA work they performed. Because the uncontroverted facts with regard to the Caretakers' claims for unpaid minimum wages and overtime compensation demonstrate that Baltimore County is entitled to judgment as a matter of law, the district court's entry of summary judgment in favor of Baltimore County is

*AFFIRMED.*

---

Caretakers' compensable duties took less than 32 hours a week to complete. *See post* at 16. Baltimore County may discharge its burden as the party moving for summary judgment "by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Baltimore County met this burden by demonstrating that during extensive deposition testimony not one of the Caretakers testified to spending over 32 hours a week on FLSA work. The Caretakers cannot survive the motion for summary judgment, as the dissent appears to suggest, by presenting evidence of the "kind of activities" that they regularly performed and merely alleging that they were not appropriately compensated for them. Fed. R. Civ. Pro. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon mere allegations.").

GREGORY, Circuit Judge, dissenting:

In affirming the district court's grant of summary judgment, the majority misapprehends this Circuit's holding in *Kelly v. Hines-Rinaldi*, 847 F.2d 147 (4th Cir. 1989), and misapplies the test announced in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Therefore, I respectfully dissent.

I.

In *Kelly* an employee filed a lawsuit alleging that his former employer violated the Fair Labor Standards Act ("FLSA"), codified at 29 U.S.C. § 201 *et seq.* (1982), by failing to pay him overtime. The undisputed facts in *Kelly* are set forth below:

> Hines-Rinaldi hired Kelly on March 12, 1982 to perform light housekeeping duties during the hours of 9:00 p.m. to 12 midnight and 6:30 a.m. to 8:30 a.m., six days per week. During the night hours between midnight and 6:30 a.m. Kelly occupied an apartment on the premises of the funeral home. This arrangement benefitted both parties, since a zoning ordinance required that someone live on the premises of the funeral home and Kelly paid nothing for the apartment. . . . Between midnight and 6:30 a.m., Kelly's only duties were to answer the telephone, if it rang, and to go out and pick up a corpse if required. If the telephone was unanswered in the funeral home after three rings, it was answered in one of three other residences where the telephone rang simultaneously. If the call involved a request to pick up a corpse, whoever answered the call would, in turn, call an assistant to help with the pick up. During the 20-month period prior to the filing of this lawsuit, there had been an average of 3.35 telephone calls and 2.2 trips to pick up corpses per month. The average time spent per trip was 49.7 minutes.

*Kelly*, 847 F.2d at 147-48. Kelly sought overtime pay under the theory that he was employed by Hines-Rinaldi from 9:00 p.m. to 8:30 a.m. the next morning. The employer disagreed, arguing that Kelly was merely waiting to be engaged during the time between shifts and,

therefore, was not working. The district court granted summary judgment to the employer, finding as a matter of law that the time between shifts was "waiting time" and, as such, was not compensable overtime.

As the majority recognizes at p. 6 of its opinion, "[T]here is no legal formula to resolve the issue." Thus, the Supreme Court has emphasized that whether waiting time is work time under the FLSA raises "a question of fact to be resolved by appropriate findings of the trial court. . . . Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged." *Skidmore*, 323 U.S. at 136-37; *Kelly*, 847 F.2d at 148.

Acknowledging that the *Skidmore* test requires a fact-intensive analysis, the *Kelly* court nonetheless found that summary judgment was appropriate because "[t]he facts in this case are basically undisputed." 847 F.2d at 147. Importantly, those facts included a concession by the employee that he averaged no more than two hours of work per month between the hours of midnight and 6:30 a.m.

In the present case, there is no similar concession by the Appellants. Although the Caretakers unreasonably seek compensation for *every* hour that they were required to be present in the parks, this fact should not preclude them from recovering under the FLSA for time actually worked. The parks remained open from daylight to dusk, 365 days a year. J.A. at 178. Assuming an average of twelve hours of daylight, the parks were open for business eighty-four hours a week. Since Appellants were required to "be of assistance to park users" while the parks were open to the public, there exists a legitimate factual question as to the amount of time worked by Appellants during business hours. J.A. at 601.

For example, Appellants were required to open the park gates in the morning, close the gates in the evening, clean the bathrooms, pick up trash, and perform moderate maintenance and repairs to the water fountains, bathroom toilets, bleachers, and picnic tables. J.A. at 200-01. Depending on park traffic, Appellants might be required to repeat these tasks multiple times a day. J.A. at 209.

On the limited record before this Court, it is impossible to quantify the amount of time that the Caretakers spent in the performance of

their duties. There is nothing, for instance, indicating how long it would take to clean one of the park's bathrooms, or how many times a day this job would need to be performed. Although these fact-laden questions remain unanswered, the majority has elected to transform the issue from a question of fact into a pure question of law.

## II.

In making this transformation, the Court commits three errors. The majority: (1) misapplies the standard for summary judgment; (2) misinterprets 28 C.F.R. § 785.23; and (3) misreads *Kelly*'s simple application of *Skidmore* to create an entirely new rule for FLSA cases.

## A.

On its motion for summary judgment, the burden is on Baltimore County to show that "there is no genuine issue as to any material fact. . . ." Fed. R. Civ. P. 56(c); *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001). That is, the County must show that no reasonable jury could conclude that Appellants were under-compensated for at least some of the hours that they worked. As the majority explains, "Dividing the weekly pay [$163.33] by the minimum hourly wage [$5.15], . . . each Caretaker couple was compensated for no more than 4.5 hours of work per day, approximately 32 hours per week." Majority Op. at 11. Thus, the question for summary judgment becomes whether a reasonable jury could find that the Caretakers worked more than 4.5 hours per day.

Despite the majority's assertion to the contrary, the County's motion is not "properly-supported" on this point. Majority Op. at 8. Appellee has presented no evidence to suggest that the Caretakers — who opened and closed the parks, cleaned the restrooms, picked up the trash, performed moderate maintenance, kept an eye out for potential vandals, and generally made themselves available to park users — could not possibly have worked more than 4.5 hours a day.

Instead of noting Appellee's lack of evidence, the Court affirms the district court's grant of summary judgment because the non-movants "have failed to set forth any specific facts." Majority Op. at 8. Admit-

tedly, the Caretakers have not provided a detailed accounting of the exact hours they worked.* Yet, as explained above, it is not their burden to prove conclusively that they worked more than thirty-two hours a week. Appellants have presented evidence of the kind of activities that they regularly performed as Caretakers. Because the County has not proven that these duties took less than 4.5 hours a day to complete, a legitimate factual issue remains. The movant has therefore failed to meet its burden under Rule 56(c), and summary judgment is improper.

B.

The Court's second error is in interpreting 28 C.F.R. § 785.23 to require the Caretakers to "produce specific facts to . . . support their assertion that they were 'working' within the meaning of the FLSA *the entire time* they were present in the park." Majority Op. at 7 (emphasis added). The regulation states, "An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises." 28 C.F.R. § 785.23. While this language creates a presumption that the Caretakers did not work twenty-four hours a day, it does not require Appellants to prove that they were working "the entire time" to be able to state a claim under the FLSA.

As explained above, Appellants are entitled to damages under the FLSA if they worked more than 32 hours per week. The evidence of the Caretakers' varied employment duties creates a genuine issue as to this material fact that precludes summary judgment.

---

*Appellants were seeking compensation for the full 24 hours that they were required to be on premises each day. Apparently, they did not wish to limit their FLSA claim by asserting that they worked a specific number of hours — more than 4.5 hours per day, but less than 24 hours. For this reason, they did not submit any affidavits as to the exact hours worked. Instead, their evidence focused on their daily employment duties.

## C.

The Court's most serious error, however, is its suggestion that *Kelly v. Hines-Rinaldi* narrows the application of *Skidmore*. The majority explains:

> The Caretakers argue that under the *Skidmore* test, summary judgment is inappropriate because whether they were "engaged to wait" or "waiting to be engaged" is itself a material issue of factual dispute. This court, however, previously has rejected such a reading of *Skidmore* by determining that an employee was "waiting to be engaged" as a matter of law.

Majority Op. at 6-7. The majority does not point to any language in *Kelly* that would limit *Skidmore*'s fact-based approach, or would create a presumption in favor of employers.

The sole issue before the *Kelly* court was "whether under the facts of this case the hours between midnight and 6:30 a.m. are properly considered working hours." 847 F.2d at 148. After reviewing the undisputed facts, the court noted, "Numerous cases have held that nighttime hours in circumstances similar to the situation presented by this case are not working time." *Id.* The Court then applied *Skidmore*, and affirmed the district court. In short, *Kelly* was nothing more than the a straightforward application of *Skidmore* to the facts of one particular case. This Court, however, cites *Kelly* for the general proposition that time spent living on an employer's premises will, as a matter of law, be presumed to be for the employee's benefit, not the employer's. *See* Majority Op. at 7 n. 5.

In his concurrence in *Kelly*, Judge Murnaghan worried that future courts might misunderstand the court's holding, expanding it to establish just such a general rule of law. Such an expansion, he counseled, would be a mistake. "A general rule of that type favoring the employer could hold the potential for abuse . . . ." *Kelly*, 847 F.2d at 149. He continued, "Judge Chapman [in writing the majority opinion,] has largely allayed my concerns by carefully confining his decision in a manner comporting with the finest traditions of Anglo-American jurisprudence and deciding only 'under the facts of this case.' As he points out, the question is preeminently one of fact . . . ."

*Id.* Despite this explicit warning, the majority today invents a new, broadly worded rule.

Because this rule directly contradicts *Skidmore*'s pronouncement that these FLSA claims involve "question[s] of fact to be resolved by appropriate findings of the trial court," I respectfully dissent.