**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 20-2153**

───────────────

OLIVIA NEAL,

        Plaintiff – Appellant,

   v.

EAST CAROLINA UNIVERSITY,

        Defendant – Appellee,

   and

UNIVERSITY OF NORTH CAROLINA,

        Defendant.

───────────────

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  W. Earl Britt, Senior District Judge.  (5:17-cv-00186-BR)

───────────────

Argued:  September 14, 2022             Decided:  November 4, 2022

───────────────

Before KING, AGEE, and THACKER, Circuit Judges.

───────────────

Affirmed by published opinion.  Judge Agee wrote the opinion in which Judge King and Judge Thacker joined.

───────────────

**ARGUED:** Glenn A. Barfield, HAITHCOCK, BARFIELD, HULSE & KINSEY, PLLC, Goldsboro, North Carolina, for Appellant. Vanessa N. Totten, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Joshua H. Stein, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

———————

AGEE, Circuit Judge:

After East Carolina University ("ECU") dismissed Olivia Neal from its School of Social Work's Master's Degree program, Neal sued the university alleging that its decision discriminated against her in violation of the Americans with Disabilities Act ("ADA"). *See* 42 U.S.C. § 12132; *see also* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. The district court disagreed and granted summary judgment to ECU based on its conclusion that Neal failed to come forward with evidence creating a genuine issue of material fact to support two elements of a *prima facie* case of discrimination. It determined that the record did not show that (1) she was "otherwise qualified to participate in ECU's" program or (2) ECU dismissed her "on the basis of" her disability. *Neal v. Univ. of N.C.*, No. 5:17-CV-186-BR, 2020 WL 5775145, at *6–7 (E.D.N.C. Sept. 28, 2020). Neal challenges both grounds on appeal. For the reasons set forth below, we affirm the district court's judgment in favor of ECU.

I.

To begin we provide a brief overview of the law governing ADA discrimination claims in the context of collegiate studies. Title II of the ADA prohibits public universities such as ECU from excluding individuals from their programs "by reason of" their physical or mental disabilities. 42 U.S.C. § 12132. Plaintiffs can prove their claim by pointing to direct evidence of discrimination or, more commonly, by using the three-step analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This burden-shifting analysis requires a plaintiff first to establish, by a preponderance of the evidence,

3

a *prima facie* case of discrimination. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981). Once a plaintiff meets that initial burden, the burden shifts to the defendant to show that its decision was made "for a legitimate, nondiscriminatory reason," and if that hurdle is crossed, then the presumption of discrimination is rebutted and the burden returns to the plaintiff to prove that the university's proffered reason was pretext for discrimination. *Id.* at 253.

To state a prima facie case of ADA discrimination in the context of a university's academic programs, a "plaintiff must establish that (1) [s]he has a disability, (2) [s]he is otherwise qualified to participate in the defendant's program, and (3) [s]he was excluded from the program on the basis of h[er] disability." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012) (footnote omitted).

As for the first element, a plaintiff has three paths of proving she has a disability. 42 U.S.C. § 12102(1). First, she can prove that she has "a physical and mental impairment that substantially limits one or more major life activities" as those terms are further defined in statutes and regulations. *Id.* Second, she can prove that she has "a record of such an impairment." *Id.* Or, third, she can prove that the defendant "regarded [her] as having such an impairment." *Id.*

The second element of the *prima facie* case—proving that the plaintiff is "otherwise qualified" to participate in the program—requires her to show that she is someone "who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for participation in a program or activity." *Halpern*, 669 F.3d at 462 (alteration in original) (citation omitted). Because courts are "particularly ill-

4

equipped to evaluate academic performance," they generally afford "some level of deference to schools' professional judgments regarding students' qualifications" for participating in their academic programs. *Id.* at 463 (cleaned up).

The third element of the *prima facie* case is causation, and in the ADA context, the Court has held that proving discrimination "on the basis of" disability "requires only that the disability was '*a motivating cause*' of the" university's decision. *Id.* at 462 (emphasis added).

## II.

With this baseline for understanding Neal's claim, we turn to the record, reciting the underlying facts under the same principles that constrained the district court when assessing whether to award summary judgment. In short, for purposes of appeal, we examine the facts in the best light for Neal, "believ[ing]" her evidence and drawing "all justifiable inferences" in her favor. *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001); *see* Fed. R. Civ. P. 56(a).

### A.  ECU's Master's of Social Work Program

ECU's School of Social Work offers a Master's of Social Work Degree Program (the "MSW Program"), which consists of both traditional classroom courses and an internship (referred to as "field instruction"). For the latter component, the MSW Program places students with an outside agency or organization and provides multiple levels of coursework and oversight for which students receive one course grade. Field instruction consumes a significant portion of MSW Program students' time, as they are generally

expected to work three days a week for 8 hours a day (24 hours per week) while completing other program requirements the rest of the week. An MSW Program faculty member serves as the liaison with the agency or organization and also oversees a weekly seminar course students must attend. A "field instructor" serves as an overarching supervisor for the student's field work. The MSW Program typically recruits licensed clinical social workers in the community to serve in this role. Field instructors typically meet weekly with their students to provide regular individualized guidance. Lastly, an employee at the agency or organization serves as a student's "task supervisor" and oversees the student's day-to-day work. Students who graduate from the MSW Program may then complete a state's licensure process for social workers. J.A. 877; *see also* N.C. Gen. Stat. § 90B-7 (2012) (describing the qualifications for "Certified Master Social Worker" and "Licensed Clinical Social Worker," both of which include having at least a master's degree from a college or university with an accredited social work program).

Because the MSW Program is a professional degree, it serves a "gate-keeping function" to "graduate[] only persons who will make competent practitioners." J.A. 878–79. In furtherance of this function, ECU will "not graduate a person who ha[s] exhibited behavior that could pose a danger to the well-being of vulnerable social work clients." J.A. 878–79. Relatedly, "a student's academic performance is not judged solely on grades. Academic performance includes a student's behaviors, including whether they are being disruptive, unprofessional, or failing to attend classes." J.A. 881. Consistent with these requirements, the MSW Program holds its students not just to ECU's code of conduct, but also to the standards set out in the National Association of Social Workers' (NASW) Code

6

of Ethics and the Council on Social Work's core competencies for social workers. J.A. 881–82. The MSW Program's Field Manual provided that "[u]nprofessional conduct or a breach of the NASW Code of Ethics may be deemed to be serious enough to terminate field work and the social work program." J.A. 881. The MSW Program reserved the

> right to remove a student from a field placement and/or the program if, in the opinion of the faculty, the student lacks the maturity, judgment, or professionalism to function in the field of social work. If it is recommended that a student withdraw from field [instruction], s/he cannot be readmitted during that semester. The student must repeat the full semester, including a field experience, in order to graduate.

J.A. 389.

When concerns about a student's performance in the MSW Program rise beyond those capable of being adequately addressed between an individual faculty member and the student, ECU authorizes the convening of an Admissions & Retention Committee ("A&R Committee"). J.A. 883. The A&R Committee's goal is to "help[] a student determine a remedial course of action to ensure successful completion of the program," including "suggestions for improved performance," clarifying both academic and "nonacademic competencies expected of students," and developing a strategy for "thoughtful and professional" interactions with "instructors, classmates, colleagues, clients and supervisors." J.A. 883. An A&R Committee is also charged with recommending "a specific course of action" for students to follow and "has the authority to determine if those [expectations] were met, and may terminate a student from the program if they were not." J.A. 883–84; 821 (2012–2013 Graduate Catalog: "[G]raduate advisory committees may render judgments as to whether satisfactory progress is made toward the degree, taking into

7

account all aspects of academic performance and promise, not necessarily course work alone. . . . Failure to meet programmatic/departmental standards may result in program termination."). As Professor Nancy Pierson, who was the Director of Field Education for the MSW Program during the relevant time, put it,

> when a student was having some difficulties or there were some issues or problems that were affecting their success . . . in the program or the course and internships in any way, we could have an [A&R Committee] meeting to try to identify what was happening, what those difficulties might be and to try to figure out a way to help that student take some remedial actions, some change, some additional support and training so that they could be retained if at all possible and complete their program.

J.A. 884.

### B. Neal's First Two Years in the MSW Program

Neal began her studies in the MSW Program in the Fall 2012 semester.[1] Her first two semesters, she maintained a 3.8 and 4.0 GPA, respectively.

In her third semester (Fall 2013), Neal voluntarily withdrew from the MSW Program. During her field instruction at a hospital that semester, a client attempted suicide in Neal's presence, which caused her intense trauma that, in hindsight, she states she did not know how to process or discuss with others. Neal later explained that this incident, combined with an abusive living situation at the time, led her to miss a significant amount

---

[1] In her application's personal statement, Neal disclosed that she'd been diagnosed with ADHD. At no time did she request an accommodation based on that diagnosis and her ADA claim does not allege discrimination on account of that condition.

8

of coursework. It also led to her eventual hospitalization for about two weeks during which time she missed additional coursework.[2] Consequently, she voluntarily withdrew.

After Neal and her parents met with faculty members, Neal was permitted to re-enroll in the MSW Program for the next semester (Spring 2014) despite the program's usual policy of requiring students who had withdrawn and wanted to return to do so at the same time the following academic year to maintain continuity of training. At Neal's request, she was assigned to a different organization for field instruction, the House of Fordham, which provides services to individuals needing assistance with food, housing, and motherhood. For the Spring 2014 semester, Neal maintained a 4.0 GPA.

## C. Neal's Fall 2014 Semester

Several incidents in the Fall 2014 semester led the MSW Program to convene an A&R Committee to meet with Neal about her behavior, performance, and continued enrollment.[3] The problems the Committee identified varied, but included Neal often using her phone during class for non-class purposes, being habitually tardy and leaving for extended periods during class, turning in assignments late or not at all, and ignoring faculty communications requesting responses. In addition, peers complained to faculty about

---

[2] There's no indication in the record that ECU was apprised of the full circumstances surrounding Neal's missed coursework or eventual hospitalization before her decision to withdraw.

[3] Neal's Fall 2014 A&R Committee included its chairwoman Dr. Kerry Littlewood (Assistant Director of ECU's School of Social Work and Coordinator for the MSW Program), Dr. Lena Carawan (an MSW Program professor), and Professor Nancy Pierson (Director of Field Education for the MSW Program). Here and throughout this opinion, individuals who were or are affiliated with ECU are identified by their titles at the time of the described events.

Neal's disruptive behavior and uncivil comments, as well as her method of participating in team assignments (including taking a "my way or not at all" approach to group assignments and failing to complete individual tasks assigned to her). During the field instruction seminar, students expressed concern about sharing sensitive client information in front of Neal, fearing that she would misuse it. In addition to individual professors addressing concerns with Neal (to no effect), Dr. Carawan elected to split her seminar into two groups so that those "most bothered" by Neal were separated from her. J.A. 782.

In addition, Neal's field instructor—a social worker in the community, Michael Herring—resigned from that role, leaving her without a necessary supervisor in that component of her required coursework.[4]

During a mandatory A&R Committee meeting, faculty reiterated to Neal that she needed to improve her attendance, participation, and coursework because her "negative behavior was having [a negative effect] on [her] ability to successfully complete the curriculum." J.A. 889. After Neal complained of various personal problems during the meeting, Dr. Littlewood also recommended that she see ECU's counseling services program. Neal understood that one purpose of the meeting was to assess whether she would be permitted to remain in the MSW Program and that her "failure to improve could result

---

[4] The record does not contain any statement directly from Herring explaining why he withdrew as Neal's supervisor. And while statements appear from other MSW Program faculty regarding their understanding about why he withdrew, Neal challenges those statements as inadmissible hearsay and something about which a genuine issue of fact exists. Because Herring's reasons for withdrawing are not material to the district court's decision or our review, we need not rely on or recount that challenged material. It's undisputed that Herring withdrew from this role, an act that compromised Neal's ability to complete necessary components of her field instruction.

10

in [her] termination from the" program. J.A. 889. She also expressed her agreement "to make changes" going forward. J.A. 889. As part of their conversation about Neal's future in the program, Professor Pierson agreed to serve as Neal's field instructor for the rest of the semester so that she could continue with her fieldwork at House of Fordham. And throughout the rest of the semester, Professor Pierson and Dr. Carawan worked with Neal to complete all overdue and remaining coursework.

Separate from the A&R Committee proceedings, Neal was also brought before ECU's Office of Student Rights and Responsibilities (OSRR). In October 2014, Neal was arrested and charged with the state criminal offense of simple assault following a physical altercation with her sister. The charge was later dismissed. When the OSRR learned of the charge, it treated the incident as a violation of ECU's student code of conduct. As a sanction, it required Neal to undergo counseling and to verify having done so by February 6, 2015.

Based on her progress and performance in the second part of the semester, Neal received As in all her classes.

### D. Neal's Spring 2015 Semester

A few weeks into the Spring 2015 semester, Neal engaged in several specific incidents that alarmed MSW Program faculty. On February 10, Neal met with one of her instructors, Dr. Intae Yoon in his office ostensibly to discuss her topic for a semester project, the prospectus for which was past due. The meeting lasted about two hours, during which Neal "switched from one topic of conversation to another about personal matters unrelated to the MSW program such as her boyfriend, financial difficulties, a bad

11

relationship with her parents, and her plan to attend law school in California." J.A. 633. At times, she raised her voice. When Dr. Yoon asked her to leave, she refused, "continu[ing] to talk about incoherent topics. Sometimes she would cry and then smile." J.A. 633. She told Dr. Yoon she would stand behind his vehicle so that he could not leave campus. In his declaration, Dr. Yoon characterized Neal as engaging in an "extreme level of disruptive and inappropriate behavior" that was "so incoherent, we were not . . . communicating at all" that day. J.A. 633. Other MSW Program faculty overheard the outburst, interceded, and managed to calm Neal. When questioned about the incident during her deposition, Neal conceded that she "essentially didn't let [Dr. Yoon] leave" his office. J.A. 2340. And she characterized her words and conduct toward him that day as "disrespectful," J.A. 2341, and "not acceptable," J.A. 2344.

On February 20, after OSRR emailed Neal a reminder that she was "over due [sic] on [her] Counseling verification" from its fall sanction, Neal called that office and left a rambling and incoherent voicemail message that ran over five minutes long. In her deposition, Neal agreed that doing so had not been an exercise of her "best judgment," and was "inappropriate" and "unprofessional." J.A. 892, 2519.

Just after midnight on February 21, Neal replied to the OSRR email and copied ECU staff and MSW Program faculty on her response. It too can be characterized as rambling and incoherent, as exemplified by the following excerpt: "I am *really* tired, and sick and tired, and actually **exhausted**, with getting emails of this nature. Could one of you, or ANY of you, try to explain this to me? . . . I would *really prefer,* that we handle this in a quick and easy manner. I would also **_also realllllly prefer,_** to not get any kind of legal, drama

12

(in any sense of the word)." J.A. 457–58. In her deposition, Neal again agreed that the email "doesn't make any sense" and that sending it had been "unprofessional" and "inappropriate." J.A. 892, 2523.

Three separate and significant interactions occurred on February 25. At 3:20 a.m., Neal sent Dr. Carawan and Professor Pierson an email labeled "URGENT: Field Visit" in which she apologized for her untimely response, explaining, "it has been an EXTREMELY enduring day," and she'd "really like to have the field visit occur tomorrow, however, I have some (unfortunately, safety-related) concerns I need to speak with you about prior." J.A. 460. She closed the email, "Thanks for all you do, Love, Olivia L. Neal MSW3 ;)." J.A. 460. Later in the day, Neal and Professor Pierson spoke on the telephone. During the call, Neal exhibited "rapid and pressured" speech and disorganized thinking that "jump[ed] from topic to topic," making it difficult for Professor Pierson to communicate with her. J.A. 729. At one point, she told Professor Pierson "to shut up and listen to her." J.A. 729. That evening, Neal emailed around thirty people, including individuals affiliated with ECU and the MSW Program. Attached to the email was a video Neal recorded from that evening in which she was yelling at her parents. Neal subsequently characterized herself as being "'very upset,' in an 'emotionally heightened state,' 'erratic,' and 'screaming non-sense'" in the video. J.A. 893. Yet again, she acknowledged that the video was "unprofessional" and "inappropriate," and that sending it to ECU faculty and staff had not been wise. J.A. 893, 2527.

Neal's conduct between February 10 and 25 led to numerous emails between MSW Program faculty discussing Neal's interactions with them and covering such matters as

13

concern for her well-being, whether and how they could encourage Neal to seek help based on their respective relationships with her, the MSW Program's "gate-keeping function," and Neal's academic performance thus far in the semester and how to help her going forward. In describing Neal's February 10 interaction with Dr. Yoon, Neal's faculty advisor stated, "it was obvious that [she] was quite manic," J.A. 1130, while Dr. Littlewood referred to it as Neal "having an episode," J.A. 1123.

When Dr. Littlewood asked the faculty with whom Neal had course- and field- work that semester about her academic performance, the professors were equivocal. Dr. Yoon, for example, had just received an assignment from Neal that was "almost 3 weeks over due [sic]." J.A. 1133. He indicated that "it is too early to tell whether she will fail my course or not," but that they all knew Neal "is smart enough and highly likely to pass [the] course." J.A. 1136. Similarly, Dr. Carawan responded that Neal's House of Fordham "task supervisor has been very positive in her support," and "[s]o far, I have all of her assignments which is much different from fall semester." J.A. 1127.

Before chronicling the events that occurred after Neal's emails and phone call on February 25 through the MSW Program's decision to dismiss Neal on March 16, it's appropriate to note that other information came to light later, but which was not known by the MSW Program at the time it made its decision. Importantly, Neal's claim alleges discriminatory conduct permeating ECU's entire decisionmaking process—from the MSW Program's decision on March 16 through the internal appeals process upholding that decision. Moreover, Neal relies on a later-developed record to support her argument that her dismissal was motivated by unlawful discrimination. Consequently, in describing the

14

factual record, we point out not just the events of the evening of February 25 through March 16, but also what later became known about them and how they factored into ECU's total decisionmaking process.

To briefly forecast that recitation, the record evidence shows what MSW Program faculty observed during that time frame, what spurred Dr. Littlewood to convene an A&R Committee meeting where MSW Program faculty decided to dismiss Neal, and what the Committee cited as the specific grounds supporting that decision. In addition, the later-developed record partially explains Neal's actions during those three weeks. And that explanation led the Graduate Review Panel considering Neal's internal appeal of her dismissal to expressly *not* rely on anything that occurred during this timeframe as part of its recommendation to uphold her dismissal.

From the time Neal sent her email with the attached video recording on the evening of February 25 to March 5, no one at ECU, the MSW Program, or House of Fordham heard from Neal or anyone else on her behalf. She did not appear for scheduled field instruction at House of Fordham, she did not show up for two classes that met on March 3, she did not attend weekly supervisory meetings with Professor Pierson or initiate scheduling makeup sessions for a meeting cancelled due to inclement weather on February 25, she did not submit any assignments due during that period, and she did not respond to emails and phone calls from MSW Program faculty requesting that she do so.

On March 5, Neal's father contacted two individuals at ECU, the Associate Dean of Students and Professor Pierson. During the calls, Neal's father indicated only that she had been "hospitalized after having an automobile accident" on February 25. J.A. 894. While

15

he assured them Neal did not have any serious physical injury, he did not disclose the basis for her hospitalization; that she was at a mental health facility; that she did not have telephone, email, or Internet access; or that she'd been diagnosed with Bipolar Disorder. That evening, the Associate Dean emailed several MSW Program faculty to inform them of Neal's hospitalization and that he'd expressed concern to Neal's father about "the concerns that have arisen regarding [Neal's] well-being and her behavior, he was very short and repeated several times 'At this point, I think she is okay. She is seeking appropriate care.'" J.A. 1156. The next afternoon, Professor Pierson responded to that email recounting her own, similar, conversation with Neal's father and expressing her confusion about why Neal was being hospitalized for so long if she did not have any "broken bones or serious physical injuries" from the accident. J.A. 1156. She indicated that Neal's father had referred broadly to Neal being "anxious" "from the accident" and that he'd "referred to her behavior here at ECU" as "being 'anxious' and 'stressed.'" J.A. 1156.

After the Associate Dean had notified her of Neal's hospitalization, but a few hours before Professor Pierson sent her response, Dr. Littlewood emailed MSW Program faculty noting Neal's lapses in academic performance that semester and specifying that if the faculty supported her in doing so, she wanted to "pursue dismissal from our program based on not meeting the guidelines detailed in our handbook . . . for professional and ethical behavior and also being behind in field without communication by the student." J.A. 1158–60. Dr. Littlewood's email cited six specific reasons for pursuing dismissal: Neal (1) hadn't had field work supervision meetings since February 10; (2) hadn't been seen at House of Fordham in three weeks; (3) hadn't attended class "this week, nor notified instructors"; (4)

16

sent a "disturbing email" on February 20 "to the student conduct office and cced everyone"; (5) had "concerning" "confrontations with" Dr. Yoon and Professor Pierson; and (6) had "already been in this same situation last semester and convened an A&R meeting." J.A. 1158. A few days later, Dr. Littlewood announced an A&R Committee would convene to discuss Neal's dismissal.

The week of March 8 through 14 was ECU's spring break. On Friday, March 13, Dr. Littlewood emailed Neal stating that she was required to attend a Monday, March 16, meeting of the A&R Committee to discuss her continued enrollment.

The morning of March 16, the A&R Committee convened without Neal attending.[5] It reviewed Neal's entire academic record while enrolled, including her Fall 2013 voluntary withdrawal, the problems addressed during the Fall 2014 A&R Committee meeting, Neal's behavior from February 10 to 25, and her February 25 to March 16 failure to communicate through absences and missed work. The Committee considered whether to extend another opportunity to Neal to continue in the program, but decided against it given the multiple past efforts that had proven unsuccessful. Instead, it voted to dismiss Neal from the MSW Program for failure to meet its academic and non-academic standards and competencies.

---

[5] Once again, Dr. Littlewood chaired the meeting. It's not clear who attended, but Professor Pierson was present and all of Neal's faculty were invited to attend or submit information relevant to the Committee's decisionmaking process.

Neal was discharged from the hospital on Friday, March 13, and subsequently testified that she had limited telephone and no internet or email access while hospitalized. She further stated that she'd needed a new cell phone after her accident and that the Friday of her discharge was the last day of ECU's spring break, so she did not learn about the mandatory A&R Committee meeting until after it had convened.

On the evening of March 16, Neal emailed Dr. Littlewood, Professor Pierson, and faculty members explaining that she'd been hospitalized since February 25th and seeking to confirm class and supervisory meeting times and assignment deadlines. In response, Dr. Littlewood and Professor Pierson instructed Neal that instead of returning to any coursework, she should meet with them the following afternoon. Neal requested, and received, permission for her parents to attend the meeting.

At the March 17 meeting, Neal learned that the A&R Committee had decided to dismiss her from the MSW Program. She was given a letter formally dismissing her and explaining the decision. The letter cites Neal's failure to participate in several aspects of her field instruction from February 10 to March 16, her impaired functioning that was at odds with Section 4.05 of the NASW's Code of Ethics, poor class attendance, and habitually late assignments. It observed that Neal's conduct in the Spring 2015 semester was "all the more concerning" given her prior history in the MSW Program, pointing out that despite attempts to support her, she'd withdrawn from the program in the Fall 2013 semester and had earlier A&R Committee proceedings in the Fall 2014 semester. Lastly, the letter noted Neal's "erratic and unprofessional behavior" in February 2015, including the February 10 incident in Dr. Yoon's office and her failure to respond to emails from professors.

E.  Neal's Internal Appeal & Related Pre-Litigation Conduct

Neal appealed her dismissal through ECU's internal appeals process, as set out in the Graduate Handbook. A Graduate Review Panel consisting of two faculty members and one graduate student from other departments met six times from April to June 2015 to

interview Neal and MSW Program faculty; review Neal's entire record while enrolled; and review additional documentary evidence Neal submitted challenging her dismissal. Among the information Neal submitted in her defense was documentation of her hospitalization from February 26 to March 13 which—for the first time—disclosed to ECU that she had been diagnosed with Bipolar Disorder. In addition, Neal submitted her private counselor's perspective that her symptoms were now being adequately managed by medication and that she could resume normal school activities.[6]

Neal also submitted documentation to the Graduate Review Panel about how she continued her social work training in the final weeks of the Spring 2015 semester. Specifically, despite Neal's dismissal from the MSW Program, Dr. Yoon permitted her to continue attending his class because it did not involve client work. She completed all assignments. Although he could not submit a grade for her work because she was no longer officially registered, Dr. Yoon informed Neal that she would have earned a "C" in the course for the semester. Similarly, although the MSW Program had informed House of Fordham that Neal's field internship had been terminated and that any further work Neal performed would be strictly on a voluntary basis, House of Fordham allowed Neal to continue her volunteer work. Neal recruited individuals to act as the equivalent of a "field

---

[6] The record contains additional information related to the car accident and hospitalization, most of which is irrelevant to our review. Briefly, she was in the car accident February 25, but left the scene with no major injuries. The police were later called to a gas station because its employees described a woman—later identified as Neal—engaging in bizarre behavior. She was taken to a local hospital and soon transferred to a mental health facility for involuntary commitment. While there, she was diagnosed for the first time with "Bi-polar, Type 1, with the most recent episode being mania." J.A. 489; 893.

instructor" and "task supervisor," both of whom reported that Neal performed exceptionally well at House of Fordham throughout the remainder of the spring of 2015.

The Graduate Review Panel recommended affirming the MSW Program's decision to dismiss Neal and found that her dismissal was based on appropriate criteria: her academic performance and applicable professional standards. The Review Panel specifically noted Neal's "erratic and unprofessional behavior" on February 10, multiple instances of tardiness to class, and inconsistent communication with supervisors and faculty in the Spring 2015 semester. It further observed that this conduct was "a recurrence of similar incidents" in the Fall 2014 semester. But the Review Panel also noted that it did not base its recommendation on "any of the events that occurred from the date [Neal] was in an automobile accident on February 25, 2015 through March 16, 2015 when [she] indicated that cell phone and internet service was re-established for her," nor did it consider any of the evidence the parties submitted relating to Neal's "health issues," which it deemed "beyond the scope of an academic review panel." Lastly, the Graduate Review Panel declined to consider the evidence Neal submitted related to events that occurred after her dismissal, such as her continued volunteerism at House of Fordham.

In July 2015, ECU's Dean of Graduate Studies adopted the Graduate Review Panel's recommendation and upheld the MSW Program's decision to dismiss Neal.

Several months later, Neal filed a complaint with the U.S. Department of Education's Office of Civil Rights, which investigated her allegation of discrimination against ECU. In August 2017, the Office closed its investigation after finding that ECU had not discriminated against her.

20

F.  District Court Proceedings

In March 2017, Neal filed a complaint in North Carolina state court, which ECU subsequently removed to the U.S. District Court for the Eastern District of North Carolina based on federal question jurisdiction. The complaint originally named additional defendants and claims, which have since been dismissed or otherwise finally resolved and are not at issue in this appeal. The only claim relevant here is the complaint's allegation that ECU discriminated against Neal by dismissing her from the MSW Program, in violation of the ADA.

Following discovery, ECU moved for summary judgment, which the district court granted. It assumed, without deciding, that Neal could prove the first element of her claim: that ECU had regarded her as having a mental impairment such that she met the statutory definition of having a disability. However, the court concluded that Neal had not come forward with evidence that would be sufficient to show—or that showed a genuine issue of material fact with respect to—the second and third elements of her claim, that she was "otherwise qualified" to remain enrolled in the MSW Program or that ECU dismissed her from the MSW Program "on account of" her disability.

Neal noted a timely appeal from the district court's judgment, and we have jurisdiction under 28 U.S.C. § 1291.

III.

We review the district court's grant of summary judgment de novo, using the same standard as the district court: "a court should grant summary judgment only if, taking the

21

facts in the best light for the nonmoving party, no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Goodman v. Diggs*, 986 F.3d 493, 497–98 (4th Cir. 2021) (citation omitted); *see* Fed. R. Civ. P. 56(a). When there's a "failure of proof concerning an essential element of a plaintiff's case," summary judgment is appropriate regardless of the evidence proving other elements of the claim. *Haulbrook*, 252 F.3d at 702 (cleaned up).

Neal contends that the district court misapplied the governing legal principles related to summary judgment and ADA discrimination claims when it concluded that the record would not support the second and third elements of her *prima facie* case. As set out below, we disagree.[7]

### A.  "Otherwise Qualified" Individual

Congress intended that the ADA "not compel educational institutions to disregard [a student's disability] or to make substantial modifications in their programs to allow disabled persons to participate." *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 405 (1979). Thus, the second element of a *prima facie* case of disability discrimination under the ADA required Neal to "present[] sufficient evidence to show . . . that [s]he could satisfy the

---

[7] In their briefs to this Court, both parties address the first element of the discrimination claim. It's not necessary to address that element to affirm, so we will follow the district court's lead and assume, without deciding, that the record would be adequate to support a finding that ECU regarded Neal as disabled at the time of her discharge from the MSW Program.

essential eligibility requirements of the [MSW] [P]rogram," *Halpern*, 669 F.3d at 462, including both its academic and non-academic criteria, *Davis*, 442 U.S. at 406.[8]

### 1. Deference in Assessing "Professionalism" Requirements

Because courts are ill-suited to the task of determining the "essential eligibility requirements" of an academic program, we traditionally afford "'great' deference to a school's determination of the qualifications" for its programs. *Halpern*, 669 F.3d at 463. This non-controversial proposition has been repeatedly acknowledged and applied by both the Supreme Court and this Court. *E.g.*, *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment."); *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978) ("[T]he determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking."); *Class v. Towson Univ.*, 806 F.3d 236, 246 (4th Cir. 2015) ("In determining whether an educational institution's eligibility requirement is

---

[8] Because this element focuses on the "essential eligibility requirements," a plaintiff may be "otherwise qualified" and yet require "reasonable modifications to [a university's] rules, policies, or practices." *Halpern*, 669 F.3d at 462. Neal represents she did *not* require *any* modifications to the MSW Program for her to be "otherwise qualified."

Consequently, this case does not present a claim that ECU failed to provide Neal with a reasonable accommodation. Neal has not and does not contend otherwise. ECU's argument that Neal's discrimination claim fails because she did not submit a timely request for an accommodation overlooks that a failure to accommodate is just one type of ADA discrimination claim. *Cf.* 29 C.F.R. § 1630.2. Consequently, that fact is not dispositive, as ECU could still be liable if Neal came forward with evidence sufficient to establish that ECU discharged her from the MSW Program on account of its perception that she had a mental impairment.

essential and whether it has been met, we accord a measure of deference to the school's professional judgment."); *Halpern*, 669 F.3d at 462–63 ("In the context of due-process challenges, the Supreme Court has held that a court should defer to a school's professional judgment regarding a student's academic or professional qualifications. Based on these cases, our sister circuits have overwhelmingly extended some level of deference to schools' professional judgments regarding students' qualifications when addressing disability discrimination claims."); *Davis v. Univ. of N.C.*, 263 F.3d 95, 102 (4th Cir. 2001) (recognizing the same). "[I]n according deference," however, "we must take special care to ensure that eligibility requirements do not disguise . . . discriminatory requirements." *Class*, 806 F.3d at 246. That care entails "assiduously review[ing] the record to ensure that the educational institution has conscientiously carried out its statutory obligation." *Halpern*, 669 F.3d at 463 (cleaned up).

As is true of many academic programs, and in particular post-graduate degree programs, "professionalism [is] an essential requirement" of the MSW Program. *Halpern*, 669 F.3d at 463. Neal stipulated to that fact. J.A. 877. What's more, the policies governing Neal's enrollment in the MSW Program plainly and clearly cautioned that a lack of professionalism could be a basis for dismissal from the program. J.A. 881 ("Unprofessional conduct or a breach of the NASW Code of Ethics may be deemed to be serious enough to terminate field work and the social work program."); J.A. 883–84 ("If the [A&R] [C]ommittee makes recommendations to the student for a specific course of action, the committee has the authority to determine if those standards were met, and may terminate a student from the program if they were not."). Neal not only agreed to be governed by those

24

policies when she enrolled, but also stipulated that MSW Program students' "academic performance is not judged solely on grades. Academic performance includes a student's behaviors, including whether they are being disruptive, unprofessional, or failing to attend classes." J.A. 881.

We are unpersuaded by Neal's argument that she met this professionalism standard because she maintained a high grade point average and had never been cited for unprofessional conduct in her field work. This argument takes an incorrect and myopic view of what conduct factors into a student's "professionalism." Without question, Neal earned high marks in her academic classes. And, by all accounts, she excelled at her field work with House of Fordham. But those are not the sole measures of "professionalism," which also appropriately consider matters such as conduct toward faculty and peers, timely communications, class and meeting attendance, and the like. Universities—not courts—are best equipped to determine what weight to give the many factors comprising the totality of a student's academic record and performance in an academic program and how that totality measures up against a program's requirements. Absent evidence of a discriminatory motive in assessing the numerous factors ECU was entitled to rely on to determine a student's qualifications to remain enrolled in one of its programs, we have no cause to accept Neal's invitation to reweigh those factors or second-guess ECU's determination that Neal failed to satisfy them.

This conclusion does not chart new territory. As the district court recognized, Neal's case bears many similarities to our decision in *Halpern*. There, a former medical student alleged that a medical school discriminated against him on account of his disability when

25

the school dismissed him for unprofessional behavior. 669 F.3d at 456. Like Neal, Halpern did not disclose any diagnoses to the school and "did not request any disability-related accommodations." *Id.* at 457. Though the precise nature of his conduct differed from Neal's, throughout his enrollment in the medical school, the student demonstrated "difficulties with professionalism" such as behaving in an abusive manner, absences without providing notice, tardiness, "resistan[ce] to feedback," and "bizarre behavior" on campus. *Id.* at 457–58. The student also had some successes throughout his enrollment, including positive feedback and "passing or honors marks" on components of his clinical rotations. *Id.* at 458.

In assessing whether the medical student had met his burden of establishing that he was "otherwise qualified" to remain enrolled, we first recognized our "comparative disadvantage in determining whether [he] is qualified to continue in the Doctor of Medicine program," leading us to "accord great respect to the [school's] professional judgment on the[] issue[]." *Id.* at 463. "[F]ind[ing] that professionalism was an essential requirement of the Medical School's program," we concluded that Halpern had failed to show that he "satisf[ied] this requirement." *Id.* Specifically, we noted that the school "identified professionalism as a fundamental goal of its educational program, and it required that students demonstrate professional behavior and attitudes prior to graduating." *Id.* Further, we rejected the student's argument that he satisfied this requirement "because he received passing marks in professionalism in his clinical rotations," because that "fail[ed] to take into account" other aspects of professionalism, including his "treatment of staff," "behavior towards faculty," "resistance to constructive criticism," and "failure to appear" for required

26

components of his coursework. *Id.* at 463–64. We observed that while none of these components may have warranted failing grades, "the school reasonably considered them as part of an ongoing pattern of unprofessional behavior" that had "the potential . . . to undermine patient care." *Id.* at 464.[9]

A similar "pattern of unprofessional behavior" appears in Neal's record and supports ECU's decision that—notwithstanding her GPA and positive feedback for field work—she lacked essential professionalism requirements of the MSW Program.

### 2.  No Genuine Material Dispute of Fact Exists in the Record

Neal makes several arguments attempting to distinguish *Halpern* and claiming summary judgment was inappropriate. None persuade us, but a few warrant further discussion.[10]

Neal asserts that a dispute in the record exists as to the factual accuracy of whether she missed classes and field supervision for unexcused reasons. She claims that this discrepancy matters because it served as one factor supporting her dismissal. We disagree.

The undisputed record shows a pattern of missed coursework throughout Neal's time in the MSW Program such that ECU could rely on that evidence as one basis for its decision. Neal voluntarily withdrew from the MSW Program in the Fall 2013 semester

---

[9] *Halpern* also addressed whether the medical student was qualified with an accommodation, an analysis that isn't required here.

[10] Neal's briefs to this Court make many sweeping claims about the record, often without any citation or with references to joint appendix pages that do not align with the brief's characterizations and arguments. We have reviewed her arguments and the record. While we address only a handful of them in the opinion, the others would fail for the same or similar reasons to those we discuss.

because she'd missed a significant number of classes, field work, and coursework. *See* J.A. 886 (stipulating "she eventually stopped attending classes altogether" that semester even before her hospitalization for two weeks). Similarly, although *absences* were not specifically identified as a problem during her Fall 2014 A&R Committee meeting, it did address related concerns such as being tardy, frequently leaving class for ten or more minutes several times during a single class, and being distracted or disruptive on her telephone rather than attentive.

As for the Spring 2015 semester specifically, Neal stipulated that the MSW Program required students and field instructors to meet "at least weekly" for supervisory meetings and that students have the responsibility to set up those meetings. J.A. 894. Because of that requirement, between February 12 and March 16, Neal "should have had at least four (4) productive supervisory sessions with [Professor] Pierson. Instead, she had none." J.A. 894.[11] In addition to missing a scheduled field supervision visit on March 3, Neal also

---

[11] Neal asserts that it was inappropriate to rely on these missed classes and supervision meetings as support for ECU's determination that she was not qualified to remain in the MSW Program because the record explains that some were due to inclement weather and some were due to her hospitalization. That argument misses the mark, as it goes to what weight ECU should have given to those absences rather than whether the record supports that they occurred.

Further, given that it's undisputed that students have the responsibility to schedule supervisory meetings each week, ECU is entitled to deference in assessing whether and how Neal attempted to reschedule or make up the missed meetings after weather foreclosed the initially scheduled meeting. Professor Pierson readily acknowledged that some of their scheduled meetings were canceled due to inclement weather, and she pointed to Neal's failure to initiate and ensure rescheduling of those meetings, as opposed to their initial cancellation, as evidence of her lack of professionalism. *See, e.g.*, J.A. 728 ("On February 17, 2015 our scheduled supervision was cancelled due to inclement weather (not the fault of Ms. Neal), however Ms. Neal did not reschedule this supervision or follow up with me (Continued)

28

missed Dr. Yoon's class and Dr. Carawan's field seminar. J.A. 893. And while Neal appeared for her field supervision on February 10,  Professor Pierson stated that she "was unable to provide supervision due to Ms. Neal" being "distracted and off topic, often moving about the room, and did not allow me to redirect her to supervision topics." J.A. 728. In short, Professor Pierson classified such "lack of engagement" in person as the equivalent of not appearing at all for their supervision meeting. J.A. 728–29. In short, the record does not contain a genuine issue of material fact about whether—over the entire course of Neal's enrollment in the MSW Program—missed classes and supervision meetings played a recurring role that could reasonably factor into ECU's retention determination.

Even more problematic for Neal, however, is that this was just one of *many* factors that (1) ECU cited at the time of her dismissal and (2) the district court pointed to as a basis for concluding that she failed to demonstrate she was "otherwise qualified" to remain in the MSW Program. Thus, even if Neal had been able to cast doubt on whether her absences from class and supervisory meetings would have warranted dismissal, that would not alter the outcome here given the totality of the undisputed record. Namely, and as recounted earlier, Neal admitted to exhibiting unprofessional behavior toward MSW Program faculty

---

as I requested. On both February 24, 2015 and March 3, 2015, Ms. Neal failed to attend our pre-scheduled supervision sessions and did not reschedule or respond to my attempts to reach her.").

Lastly, regardless of how the Spring 2015 A&R Committee weighed those missed classes and meetings in its initial decision to dismiss Neal, the Graduate Review Panel expressly did not consider any of the absences that occurred due to Neal's hospitalization when it recommended upholding the decision, nor did it specifically cite *any* absences from classes or supervision meetings as a basis for its recommendation.

29

in numerous incidents that occurred in person, on the telephone, and in writings throughout February 2015. Looking beyond her final semester of enrollment, Neal had previously been warned that her conduct, attitude, and behavior needed to change, and ECU had assisted her so that she could continue in the MSW Program. For example, she was permitted to re-enroll for the Spring 2015 semester, which was before the time generally allowed following withdrawal, and she was required to attend the Fall 2014 A&R Committee meeting at which point she was formally cautioned about her continued enrollment in the MSW Program, and its faculty implemented a support team to assist her in completing her field supervision and other class assignments.

Neal also asserts the record does not support ECU's justification that her Spring 2015 behavior was a recurrence of problems cited during the Fall 2014 semester. In support, however, Neal cites portions of her deposition testimony that do not create a genuine issue of material fact about her poor performance in the Fall 2014 semester. For example, in her deposition Neal recounted how stressful it was to put together her learning agreement each semester and she admitted to being late with the learning agreement. She further admitted that "[i]t's possible" she turned in additional late assignments based on syllabus deadlines, though she indicated her professors would sometimes allow her to turn in assignments on a different date than originally listed.[12] J.A. 2372–73. This testimony

---

[12] The learning agreement was an essential component of a MSW Program student's field work. It was both "a plan for the internship, [and] an evaluation instrument." J.A. 880. Early in each semester students would submit a draft learning agreement outlining the activities in which they would participate during their placement so that they could "gain the professional competencies set out by the Council on Social Work Education," which is
(Continued)

does not contradict her professors' repeated statements that she had trouble submitting timely class assignments. Even if professors worked with her to complete the assignments and accepted them late, a habitual inability to meet deadlines could still be a valid basis for later dismissal from the MSW Program. In Spring 2015, for instance, Dr. Yoon, accepted an assignment that was "almost 3 weeks over due [sic]," J.A. 1133, but later recounted in his declaration that although he "tried to work with Ms. Neal by grading her late assignments" throughout her enrollment, "her consistent inability to meet deadlines was unprofessional" and a factor in favor of her eventual dismissal. J.A. 632. Neal also contends that her deposition testimony contradicts other record evidence about the February 10 interaction with Dr. Yoon, namely, whether she "yelled" at or pointed her finger at him during their interaction. To put it plainly, these "discrepancies" were immaterial to assessing this incident's relevance to the decision to dismiss Neal from the MSW Program. As noted, despite Neal characterizing her raised voice as getting "louder" rather than "yelling," J.A. 2342, she admitted that the incident was "unacceptable." J.A. 891.

Nor did ECU act with an impermissible "imperial decree trumpet[ing] an arbitrary and capricious bent, demanding not merely the Court's deference but indeed its fealty," Opening Br. 34–35, by declining to consider the view of Neal's psychiatrist that she could successfully complete the MSW Program following her March 13 discharge. Whatever his qualifications in a related field or his familiarity with the professional standards applicable to social workers, Neal's psychiatrist was not a member of ECU's faculty, privy to Neal's

---

"the accrediting body for all accredited Social Work degrees in the United States." J.A. 880.

31

academic record or the assessments of those interacting with her on campus, or ultimately charged with the gatekeeping function of determining eligibility for the MSW Program. There is nothing arbitrary or capricious about declining to consider his opinion under the circumstances here.[13]

In sum, the record fully supports the district court's conclusion that ECU was entitled to deference in its conclusion that Neal no longer met the eligibility requirements to remain enrolled in the MSW Program. Nothing in the record causes us to deviate from the usual approach of affording great deference to a university's determination that a particular student fails to meet its academic and non-academic requirements, including its professionalism standards. On this record, Neal failed to come forward with evidence sufficient to support a finding that she was "otherwise qualified" to remain enrolled in the MSW Program. Because Neal cannot prove an element of her ADA discrimination claim, ECU was entitled to summary judgment.

## B. Causation

While our conclusion about the "otherwise qualified" element would be sufficient grounds to affirm the district court's judgment, we also address the court's holding that Neal had not demonstrated that her dismissal was "on the basis of" her disability. Although

---

[13] Similar limitations exist with the declaration from MSW Program professor Tracey Carpenter-Aeby, which simply states that professors had "discretion" to excuse student absences when warranted, such as in the case of hospitalization. This conclusory statement does not address Neal's academic record or whether she met the required academic standards as a holistic matter. Nor did Professor Carpenter-Aeby indicate any familiarity with Neal's record. Her generic opinion does not move the ball concerning either *Neal's* qualifications to remain in the MSW Program based on the totality of her academic record or ECU's motives in deciding to dismiss her.

the ADA's causation element can be satisfied by proof that disability was "a" motivating factor (rather than the "sole" reason) for the defendant's decision, to establish causation more is required than "[t]he fact that [the defendant] is aware of [the plaintiff's] impairment." *Haulbrook*, 252 F.3d at 703. Instead, "a plaintiff must show that the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Cogwill v. First Data Techs., Inc.*, 41 F.4th 370, 380 (4th Cir. 2022) (citation omitted). In other words, while the ADA prohibits a university from dismissing a student on account of a disability, a university is lawfully permitted to dismiss a student on account of misconduct triggered by a disability.

Neal challenges this conclusion, asserting that the record contains sufficient evidence from which a jury could find that ECU dismissed her from the MSW Program because of her disability. She points to emails between MSW Program faculty and administration in February 2015 discussing their perceptions of her mental state and her performance in the program. And she criticizes the district court's reliance on *Halpern*, arguing that the Court did not address causation in that decision, so it should not be part of a causation analysis.[14] Again, we disagree with Neal.

We've considered the February 2015 email exchanges alongside the other record evidence Neal relies on and conclude that the district court did not err in holding that the

---

[14] Throughout the appeal, Neal attempts to distinguish *Halpern* by asserting that its holding depended on an undisputed record of unprofessional behavior, which does not exist here. For the reasons already discussed, we disagree with Neal that a genuine issue of material fact exists about the circumstances leading ECU to dismiss her from the MSW Program, so this is not a valid ground for distinguishing *Halpern*.

33

undisputed record would preclude a jury from finding in favor of Neal on the issue of causation. Viewed in the light most favorable to Neal, the emails depict a faculty concerned for Neal's well-being, sensitive to when and how they could address an adult graduate student's personal matters, and fearful that her conduct and interactions with them beginning on February 10 and continuing through February 24 would affect her successful performance going forward in the semester.

Far from expressing any indication that Neal should be dismissed from the program on account of a mental impairment or perceived "manic," J.A. 1130, "episode," J.A. 1123, these emails uniformly demonstrate a genuine desire to help Neal address her health quite apart from the MSW Program and their concern that if Neal's recent *conduct* and *behavior* continued, her academic performance in the MSW Program would suffer. At no point did any of the faculty members suggest that Neal had a mental disability that could itself be a ground for removing Neal from the MSW Program. In fact, Dr. Yoon—whose email relaying concern about how Neal behaved in their meeting spurred the series of emails that followed—expressly stated the exact opposite: "Again, I do NOT mean to stop her from graduating in May." J.A. 1136.

Dr. Littlewood's role in the email thread is particularly relevant given that she later initiated and chaired the Spring 2015 A&R Committee meeting during which Neal was dismissed. At one point, she cautioned that it "may be against [the Family Educational Rights and Privacy Act] for us to discuss [Neal's mental health and medication] in relation to her performance in the MSW Program." J.A. 1136–37. And her redirect appropriately came in direct response to Neal's faculty advisor—who did not have other interaction with

34

Neal in her MSW Program classes or field work—disclosing a private conversation she'd had with Neal about her ADHD medication and whether she was in any treatment at the moment, topics that veered beyond Neal's conduct and performance in the MSW Program itself. Dr. Littlewood encouraged faculty to "hold[] [Neal] to the same [coursework] standards as other students" and to "document [any] academic issues" because "[t]hey are the issues which we can hold [her] accountable and pursue corrective action." J.A. 1137.

To conclude that Dr. Littlewood's and other MSW Program faculty's words actually show discriminatory intent would be to twist them beyond all recognition.[15] Though these emails support Neal's suggestion that MSW Program faculty and advisors were "aware" of her impairment, that does not demonstrate causation. *Haulbrook*, 252 F.3d at 703. Much more is required and here it is completely lacking. In short, nothing in the emails calls into question why the MSW Program convened the A&R Committee meeting to decide whether to dismiss Neal.

In particular, Neal's conduct from February 25 to March 16 plays a unique but central role in demonstrating the lack of evidence of causation in both the A&R Committee's initial decision to dismiss her and the Graduate Review Panel's recommendation to uphold that decision. Part of the uniqueness of that role stems from the

---

[15] In perhaps an unwittingly candid moment, Neal admits as much by arguing that her February 2015 behavior alone would not support her dismissal because the MSW Program faculty did not dismiss her immediately following her displays of mania, but instead adopted a "wait and see posture." Opening Br. 33. Instead, it was only after she missed additional communications, classes, and field work that they convened the A&R Committee to consider her dismissal in light of the totality of her academic performance and record.

fact that the A&R Committee relied on that conduct and the Graduate Review Panel refused to consider it, demonstrating both entities were not acting with discriminatory motive.

As for the A&R Committee's initial decision—that the same individuals who were party to the February 2015 emails did not act to dismiss her until after further concerning academic conduct occurred bolsters the conclusion that no causal link can be shown between Neal's disability and her dismissal. Regardless of the reasons for these events, it's undisputed that from February 25 to March 16, Neal missed class, supervision meetings, field work, and class assignments. She also failed to respond to numerous emails and phone calls from faculty requesting that she respond. Although Neal contends her post-February 25 conduct should have been excused given her hospitalization, it's undisputed that the Spring 2015 A&R Committee convened to decide her future in the MSW Program only *after* these additional events related to her academic performance occurred. It's further undisputed that at the time the A&R Committee acted, no one on the Committee knew of the reasons for her hospitalization or of her Bipolar Disorder diagnosis. Whatever their concerns about Neal's mental health in mid-February, MSW Program faculty did not convene the A&R Committee meeting to discuss Neal's dismissal until further concerns about her academic performance had occurred. And both Dr. Littlewood's email delineating the basis for convening the A&R Committee and the MSW Program's letter explaining why Neal was being dismissed cited a host of non-discriminatory reasons supporting the decision.

Further breaking the link between Neal's dismissal and any discriminatory motive is the Graduate Review Panel's independent evaluation of Neal's record and its

recommendation to uphold her dismissal while not holding Neal accountable for her conduct during her hospitalization. As discussed earlier, the Graduate Review Panel was comprised of individuals outside the MSW Program; they were not part of the February 2015 faculty emails. Moreover, the Panel expressly did not rely on any events that occurred after February 25, for which time it apparently believed Neal's hospitalization provided sufficient grounds for excusing her absences and missed work. And yet it found that the totality of Neal's academic record demonstrated grounds for not meeting the MSW Program's standards for continued enrollment. At both the initial and internal appeals stage of ECU's decision to dismiss Neal, there's no record evidence that her disability was a factor, meaning that she cannot prove this essential element of her prima facie case of discrimination.

Both the A&R Committee and the Graduate Review Panel expressly—and lawfully—pointed to Neal's January 2015 incidents in person, via telephone, and through email as factors supporting the decision to dismiss her. Although our decision in *Halpern* did not expressly address causation, the district court aptly cited it for a principle that we agree is equally relevant to the causation inquiry: "misconduct—even misconduct related to a disability—is not itself a disability and may be grounds for dismissal" *Halpern*, 669 F.3d at 464 (cleaned up). Numerous authorities acknowledge the same distinction. *Newberry v. E. Tex. State Univ.*, 161 F.3d 276, 279–80 (5th Cir. 1998) (distinguishing between dismissal for "conduct [that] is symptomatic of disability," which is a legitimate, nondiscriminatory motive and dismissal based on a "collateral assessment of disability," which would violate the ADA); *Palmer v. Circuit Court*, 117 F.3d 351, 352 (7th Cir. 1997)

37

(same); *see also Pence v. Tenneco Auto. Operating Co.*, 169 F. App'x 808, 811–12 (4th Cir. 2006) (holding employer's belief that plaintiff engaged in misconduct was a permissible nondiscriminatory reason for termination of employment even if his employer was factually incorrect and even if employer also thought the misconduct was caused by a mental impairment); 2008 EEOC Guidance, 2008 WL 4786697, at *9 ("The ADA does not protect employees from the consequences of violating conduct requirements even where the conduct is caused by the disability.").

Neal repeatedly acknowledged that her February 2015 interactions—from her February 10 incident in Dr. Yoon's office to her voicemail, emails, and phone call with Professor Pierson—were "unprofessional" and "inappropriate." But she contends that they resulted from a transient condition for which she could be adequately treated through medication and thus should not have been cited against her. Similarly, she admits that during her hospitalization, she missed multiple classes, field work, field supervision, and class assignments—though she argues those absences should be "excused" given why they occurred. But ECU was not required to retroactively excuse misconduct related to her later Bipolar diagnosis.[16] Neal's insistence to the contrary sought "not a disability

---

[16] Because it is particularly relevant here, we reiterate that Neal *never* requested an accommodation before her dismissal from the MSW Program. Further, she is proceeding solely under the "regarded as" prong of establishing a disability, which does not require *sua sponte* accommodations for a perceived impairment that has caused unprofessional conduct. *See* 29 C.F.R. § 1630.2(o)(4) (stating that covered entities are "not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong").

Critically, ECU could dismiss Neal for failing to meet the MSW Program's academic requirements—which included its professionalism criteria—even if her (Continued)

accommodation, but 'a second chance to better control [her] treatable medical condition.'" *Halpern*, 669 F.3d at 465 (quoting *Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999)); *Off. of the Senate Sergeant. at Arms v. Off. of Senate Fair Emp. Pracs.*, 95 F.3d 1102, 1107 (Fed. Cir. 1996) ("[T]he ADA . . . does not require a retroactive accommodation for a disability, which is what is meant by a fresh start."); *see also Davila v. Qwest Corp.*, 113 F. App'x 849, 854 (10th Cir. 2004) ("[E]xcusing . . . misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an after-the-fact excuse is not a required accommodation under the ADA." (citations omitted)). At bottom, Neal wants to have it both ways, arguing she was a qualified individual with no accommodation who was dismissed on the basis of her Bipolar Disorder, yet demanding that ECU had to overlook everything that occurred in February and March 2015 because of evidence about her subsequently diagnosed mental impairment. The ADA has no such requirement.

The A&R Committee appropriately relied on what it knew about Neal's performance during the totality of her enrollment, including February and March 2015 when it made the initial decision to dismiss Neal. The Graduate Review Panel did not act arbitrarily in deciding not to consider Neal's conduct after February 25 and yet to rely, in part, on her earlier conduct as a factor in recommending that decision be upheld. Neither course demonstrates a genuine issue of material fact about what led to Neal's dismissal and

---

misconduct was later disclosed to be the result of a disability so long as the disability itself was not the basis for the decision. As we recognized in *Halpern*, "the law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability." 669 F.3d at 465.

39

whether her disability was a motivating factor in that decision. We therefore agree with the district court that this separate reason also demonstrates that ECU was entitled to summary judgment.

## IV.

We in no way make light of mental illness. However, for purposes of assessing ADA compliance, universities have a responsibility to the entire academic community and to the public to ensure that a student is qualified to meet the lawful requirements of their program especially where, as here, conferral of a degree is a prerequisite to state licensure requirements. ECU properly exercised its discretion in that regard and bent over backwards to assist Neal during her enrollment in the MSW Program. It gave her a second chance with the out-of-order readmission in the Spring 2014 semester. She received a third chance in the Fall 2014 semester following the A&R Committee proceeding. And MSW Program faculty gave her a fourth chance as they tried to work with her thereafter, including during and following the February 10 encounter in Dr. Yoon's office. Now, Neal wants to force ECU to provide a fifth chance. The ADA contains no such requirement given an absence of evidence supporting her claim of discriminatory dismissal.

For the reasons set forth above, we affirm the judgment of the district court.

*AFFIRMED*

40