**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 22-1910**

───────────────

JAMIE LUSKIN,

          Plaintiff - Appellant,

   v.

UNIVERSITY OF MARYLAND, COLLEGE PARK, MARYLAND,

          Defendant - Appellee.

───────────────

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paula Xinis, District Judge. (8:20-cv-02393-PX)

───────────────

Argued:  March 8, 2023                    Decided:  April 18, 2023

───────────────

Before WILKINSON and THACKER, Circuit Judges, and MOTZ, Senior Circuit Judge.

───────────────

Affirmed by unpublished per curiam opinion.

───────────────

**ARGUED:**  Rignal Woodward Baldwin, V, BALDWIN SERAINA, LLC, Baltimore, Maryland, for Appellant.  Kathryn Joyce Bradley, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee. **ON BRIEF:** Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee.

───────────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case concerns Jamie Luskin's ("Appellant") contention that the University of Maryland, College Park ("University of Maryland") failed to adequately respond to her complaints of student-on-student sexual harassment. Specifically, Appellant maintains that she was denied equal access to educational opportunities in violation of Title IX of the Education Amendments of 1972 ("Title IX), 20 U.S.C. § 1681, et seq, as a result of the University of Maryland's deliberate indifference to her complaints of sexual harassment.

The district court granted summary judgment in favor of the University of Maryland. Because Appellant failed to present evidence sufficient to create a genuine dispute of material fact as to whether the University of Maryland acted with deliberate indifference to the harassment, we affirm.

I.

In 2017, Appellant enrolled in the University of Maryland's Doctor of Philosophy ("Ph.D.") degree program in chemical physics. As part of the program, Appellant joined a cohort of five classmates, one of which was "C.H.," the student who harassed Appellant. The harassment that formed the basis of Appellant's complaints spanned four separate instances in 2018. First, in February 2018, C.H. approached a group of students, including Appellant, who were laughing at an image on Appellant's computer. During that incident, C.H. punched a wall and began "screaming vulgarities at the group, demanding to know

2

why they were laughing." J.A. 533.[1] One of the students in the group, Eli Mizrachi ("Mizrachi"), reported the incident to the University of Maryland's Behavior Evaluation and Threat Assessment ("BETA") team. The BETA team "contacted C.H.'s professors to learn whether [he] had behaved strangely in other contexts." *Id.* at 534. But because there were no prior issues in C.H.'s record at that time, the BETA team "concluded it would monitor the situation for any potential escalation." *Id.*

Next, in April 2018, C.H. confronted Appellant in their shared office and asked "why she was excluding him from their cohort." J.A. 534 (internal quotation marks omitted). C.H. was "very angry" during this incident and was "fixating on the notion that [Appellant's] exclusion of him was intentional." *Id.* The encounter lasted only a few minutes, and afterward, "C.H. texted Appellant to ask that she not share this exchange with any other student." *Id.* Mizrachi also reported this incident to the BETA team, expressing his concern that "C.H. appear[ed] to irrationally think we've formed a high-school like clique where we make fun of him." *Id.* at 535 (original alteration adopted). The BETA team contacted Appellant to see if her office could be moved, but Appellant had already relocated into a new office so that she did not have to share an office with C.H. In any event, the BETA team referred Appellant's complaint to the University of Maryland's police department and again reached out to C.H.'s professors to determine if there were

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

3

any issues or concerns with C.H. No concerns were reported, but one professor did note, "C.H. was shy, stubborn, and got frustrated under pressure." *Id.* at 78.

The next incident involved a text message conversation between C.H. and Appellant that took place in May 2018. During that conversation, C.H. questioned Appellant about why she had been "standoffish" and had "excluded" him from the cohort group. J.A. 12. Appellant responded by explaining that she had not meant to ignore C.H. and that she did not know how to handle C.H.'s obvious anger toward her. After clearing the air, C.H. asked Appellant why she wore a ring on her index finger -- the same finger on which C.H. consistently wore a ring. C.H. claimed it could not be a coincidence as she must have seen how he wore his ring. Appellant responded that the ring only fit her index finger.

Appellant also made clear that she was in a serious relationship. In response to Appellant's comment about her relationship status, C.H. stated, "[w]hoever he is, he must be an amazing guy." J.A. 13. C.H. then asked a few additional questions about Appellant's relationship, such as, "[d]id he get you something thoughtful for Valentine's [D]ay?" and "[h]e must take you on really wonderful dates doesn't he?" *Id.* Before signing off "good night," C.H. said that he would have to "respect that" Appellant was in a relationship and that he wished he "could be that person for someone." *Id.*

Appellant met with the BETA team after the May 2018 text message incident. After listening to her concerns, Appellant's case manager, Maria Lonsbury ("Lonsbury"), took Appellant to the counseling center as she was visibly upset. Lonsbury informed Appellant that the BETA team would reach out to C.H. to discuss her complaint. However, Appellant requested that the BETA team not contact C.H. until she filed a sexual misconduct report

4

against him with the Office of Civil Rights & Sexual Misconduct ("OCRSM"). Appellant filed a report with the OCRSM the next day.

The OCRSM reviewed Appellant's complaint and determined that because "the alleged misconduct did not present as something that was specific to her as a female or anything that was sex based," C.H.'s actions "fell outside of the purview of Title IX." J.A. 537. Accordingly, the OCSRM concluded that the Office of Student Conduct ("OSC") "remained the best suited department to deal with the complaint." *Id.* However, despite concluding that this was not an incident of sex-based misconduct, the OCSRM "recommended to the OSC that it issue a no-contact order against C.H." *Id.* The OSC issued a no-contact order two days after the incident occurred. The no-contact order indicated that failure to comply with the order would result in disciplinary action. The Director of OSC, Dr. Andrea Goodwin ("Goodwin"), met with C.H. to review the no-contact order and "talk about potential consequences for a violation of the no-contact directive." *Id.* at 131. C.H. left campus a week after his meeting with Dr. Goodwin to study abroad in Spain and did not return to campus until August 2018.

The final incident occurred two months later in October 2018, after C.H. returned to the country, when C.H. "burst into [Appellant's] student office and confronted her about the no-contact order." J.A. 538. C.H. was "angry, red in the face, [and had his] hands in his pockets." *Id.* Appellant ran out of the office and reported the incident to the police and the OCRSM. At the OCRSM's office, Appellant met with former Title IX Investigator, Mark Nelms ("Nelms"), who recommended that she file a peace order with the state court to secure protection both on and off campus. Appellant subsequently secured a peace order

from the state court that was valid for six months.  The peace order prohibited C.H. from contacting Appellant.

Additionally, Nelms filed a report with the OSC stating that C.H. violated the no-contact order.  In the report, Nelms indicated that Appellant "did not feel safe in the same building as C.H." and "would like for [C.H.] to be suspended and excluded from campus." J.A. 539 (original alteration adopted and internal quotation marks omitted).  Upon receiving the report, Dr. Goodwin informed C.H. that he was "charged with violating the Code of Student Conduct for failing to comply with the no-contact order." *Id.*  As a result of his violation of the no-contact order, C.H. was barred from all classes for the rest of the week and was instructed to meet with Dr. Goodwin and campus police.  At that meeting, C.H. admitted that he violated the no-contact order and agreed to undergo a psychiatric evaluation.  C.H. was also transitioned to online classes for any classes that he had with Appellant, placed on disciplinary probation until the end of the semester, and barred from entering the Atlantic building -- the building where students in the program attended class and had laboratory space -- except through designated entrances and exits.  In addition, C.H. was warned by Dr. Goodwin that "any violation of the no-contact or Peace Order could result in additional sanction, to include suspension or expulsion." *Id.* at 540.

At her deposition, Appellant testified that she switched from the Ph.D. program to the master's degree track after the October 2018 incident because she felt like "[t]here really [was] no safety plan" that could ensure she and C.H. were kept "apart" and that staying at the University of Maryland was not a "sustainable plan." J.A. 435.  Appellant graduated from the University of Maryland in May 2019 with a master's degree in chemical

physics. Toward the end of 2019, Appellant decided to re-enroll in the University of Maryland's chemical physics Ph.D. program and work toward completing her degree remotely.

On August 18, 2020, Appellant filed suit against the University of Maryland alleging that she was denied equal access to educational opportunities in violation of Title IX, 20 U.S.C. § 1681, et seq. On July 29, 2022, the district court granted the University of Maryland's motion for summary judgment. In its summary judgment order, the district court first concluded that nothing in the record created a genuine dispute of material fact as to whether Appellant was denied access to educational opportunities. Second, the district court determined that even if Appellant was denied access to educational opportunities, liability could not be imputed to the University of Maryland because Appellant failed to establish that the University of Maryland was deliberately indifferent to the harassment. Appellant timely filed her notice of appeal.

II.

"We review the district court's grant of summary judgment de novo, using the same standard as the district court." *Neal v. E. Carolina Univ.*, 53 F.4th 130, 144 (4th Cir. 2022). We "grant summary judgment only if, taking the facts in the best light for the nonmoving party, no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted).

III.

Appellant argues that the district court erred in finding she was not denied access to educational benefits and by determining the University of Maryland did not act with

7

deliberate indifference to the harassment she endured. To establish a Title IX claim based on student-on-student sexual harassment, a plaintiff must prove:

> (1) they were a student at an educational institution receiving federal funds; (2) they suffered sexual harassment that was so severe, pervasive, and objectively offensive that it *deprived them of equal access to the educational opportunities or benefits provided by their school*; (3) the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment; and (4) the *school acted with deliberate indifference to the alleged harassment*.

*Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263–64 (4th Cir. 2021) (emphasis supplied). This dispute focuses on the second and fourth elements.

As for the second element, the district court determined, "a reasonable juror could conclude that C.H.'s actions toward [Appellant] were harassment because of her sex." J.A. 543. On this point the district court noted, "C.H. appeared to desperately seek [Appellant's] attention, angrily demand it." *Id.* Focusing on the April, May, and October incidents, the district court emphasized, "[a] factfinder could reasonably find these interactions, in total, give rise to the inference that C.H. wanted a romantic relationship with [Appellant] and thus targeted her because of her sex." *Id.* at 544. After finding that the harassment was severe and pervasive, the district court ultimately concluded that Appellant failed to satisfy the second element because "she [could not] show physical exclusion or denial of access to her education," nor could she "demonstrate a 'concrete, negative effect' on her ability to participate in her program." *Id.* at 546.

Moving to the fourth element, the district court held that "even if [Appellant] was somehow barred from accessing educational opportunities at the University [of Maryland],

8

no facts support a finding of liability against the institution." J.A. 547. In reaching this conclusion, the district court noted, "an institution exhibits deliberate indifference when its response is clearly unreasonable in light of the known circumstances," *id.* (internal quotation marks omitted), and "[o]n this record, no reasonable factfinder could conclude that the University [of Maryland's] response was clearly unreasonable," *id.* at 548 (internal quotation marks omitted). The district court rejected Appellant's argument that the deliberate indifference inquiry is ill-suited for resolution at the summary judgment stage, reasoning, "where . . . the record indisputably demonstrates that the defendant-institution took a series of reasonable and responsive steps to stop the harasser, the deliberate indifference inquiry is no less capable of resolution at summary judgment than any other element of the claim." *Id.* (citing *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016)).

## A.

Starting with the second element, we agree with the district court that the harassment was as a result of Appellant's sex and that it was severe and pervasive. However, we part ways with the district court's conclusion that the harassment did not deprive Appellant of educational opportunities or benefits. Appellant cites our decision in *Jennings v. Univ. of N.C.*, 482 F.3d 686 (4th Cir. 2007), to support her argument that C.H.'s sexual harassment caused a concrete, negative effect on her educational opportunities. *Id.* at 691. In *Jennings*, we determined that a collegiate women's soccer coach's sexual commentary and advances toward the student-athletes caused a negative effect on the student-plaintiff's educational opportunities "because the hostile soccer environment made it difficult [for the student] to

9

focus on her studies." *Id.* at 700. The student-plaintiff's GPA in *Jennings* was barely above passing, ranging from a 1.96 to a 2.02. *Id.* Additionally, the *Jennings* court noted that a psychiatric opinion was presented indicating that the coach's "destructive practice of verbal sexual abuse caused [the plaintiff] to suffer severe emotional distress." *Id.* at 699.

Here, although Appellant's academic record during her time at the University of Maryland was "consistently good," she has nonetheless altered her academic pursuits as a result of C.H.'s harassment. J.A. 435. Like the plaintiff in *Jennings* who struggled to focus on her studies as a result of the coach's harassment, Appellant testified that she decided to switch to the master's degree program after realizing that completing her Ph.D. at the University of Maryland was not a "sustainable plan" because "[t]here really [was] no safety plan" that kept her apart from C.H. *Id.* While it is true that Appellant later got back on track toward obtaining her Ph.D. at the University of Maryland, the harassment interrupted her education and delayed her Ph.D. by at least one year. Moreover, the harassment deprived Appellant of the opportunity to complete her Ph.D. on campus as she originally planned. Instead, she will complete her degree while residing in California. All told, we conclude that Appellant has, at a minimum, provided sufficient evidence to create a genuine dispute of material fact as to whether she was deprived access to an educational benefit as a result of the harassment.

## B.

Turning to the fourth element, Appellant argues that the University of Maryland's categorization of C.H.'s harassment as student misconduct rather than sexual harassment creates a genuine dispute of material fact as to whether the University of Maryland was

10

deliberately indifferent to the harassment.  Specifically, Appellant contends that if her complaints were channeled through the process required for sexual harassment complaints, the University of Maryland would have conducted a full Title IX investigation.  The district court rejected this argument, reasoning that "[e]ven assuming the University [of Maryland] did not meet its own Title IX protocols, failing to strictly adhere to sexual harassment policies is not determinative."  J.A. 549 (original alterations adopted and internal quotation marks omitted).  The district court also noted, "assuming the OCRSM should have deemed this a 'sex-based' harassment, this failure alone does not generate a genuine dispute of fact as to whether the University [of Maryland's] response to the known threat was *clearly unreasonable*."  *Id.* (internal quotation marks omitted and emphasis supplied).

We agree with the district court.  Here, the question is whether the University of Maryland's response was "clearly unreasonable in light of the known circumstances." *S.B. ex rel. A.L*, 819 F.3d at 77.  The University of Maryland's response was not clearly unreasonable because it: (1) swiftly responded to each incident; (2) contacted C.H.'s professors to determine if they had any concerns relative to C.H.'s behavior; (3) attempted[2] to relocate Appellant to a new student office away from C.H.; (4) issued a no-contact order *within two days* of being notified of the text message incident; (5) transitioned C.H. to online classes after he violated the no-contact order; (6) placed C.H. on disciplinary probation until the end of the semester; (7) encouraged C.H. to undergo a psychiatric

---

[2] We say "attempt" here because, as explained above, it appears that Appellant had already moved to a new office when the BETA team reached out to see if her office could be moved.

11

evaluation; and (8) barred C.H. from entering the building except through designated entrances and exits. These actions are sufficient to establish that the University of Maryland took Appellant's complaints seriously and responded in a reasonable manner.

To the extent Appellant takes issue with the fact that C.H. was placed on probation instead of being suspended or expelled, we have made clear that this is insufficient to prove deliberate indifference because "it is not enough that a school has failed to eliminate student-on-student harassment, or to *impose the disciplinary sanctions sought by a victim.*" *S.B. ex rel. A.L*, 819 F.3d at 77 (emphasis supplied). Because the University of Maryland responded swiftly and reasonably to Appellant's complaints of sexual harassment, we conclude that the district court properly determined that there is no evidence in the record which creates a genuine dispute of fact as to whether the University of Maryland was deliberately indifferent to the harassment.

In sum, although Appellant presented sufficient evidence to overcome summary judgment as to the first three elements of her Title IX claim, because the University of Maryland's response to Appellant's complaints was not clearly unreasonable, we conclude that the district court did not err in granting University of Maryland's motion for summary judgment.

IV.

Therefore, we affirm.

*AFFIRMED*

12